In the Matter of MERCHANTS STORAGE COMPANY OF VIRGINIA, INC., Bankrupt.

In the Matter of MERCHANTS INTERNATIONAL, INC., Bankrupt.

MERCHANTS FUND, INC., Plaintiff,

v.

Richard A. BARTL, Trustee for Bankrupts, Defendant and Third-Party Plaintiff,

v.

CHARTER MOVING & STORAGE COMPANY, INC., Richard M. White, Jerry H. Sills and C. J. Sills, Jr., Defendants.

and

In the Matter of MERCHANTS STORAGE COMPANY OF VIRGINIA, INC.

In the Matter of MERCHANTS INTERNATIONAL, INC.

In the Matter of MERCHANTS, CUSTOMHOUSE BROKERS, INC.

In the Matter of MERCHANTS MANAGEMENT, INC., Bankrupts

Richard A. BARTL, Trustee, Plaintiff,

v.

CHARTER MOVING & STORAGE COMPANY, INC. and Richard M. White and Jerry H. Sills and C. J. Sills, Jr., Defendants.

Bankruptcy Nos. 79–606–A to 79–609–A.

United States Bankruptcy Court, E. D. Virginia, Alexandria Division.

Nov. 12, 1981.

**450**

Bruce Goldstein, Arlington, Va., for bankrupts—Merchants Storage Co. of Virginia, Inc., Merchants Intern., Inc., Merchants Customhouse Brokers, Inc., and Merchants Management, Inc.

Richard A. Bartl, Alexandria, Va., Trustee in Bankruptcy.

Robert O. Tyler, Alexandria, Va., for Trustee.

Francis B. Plattner, Arlington, Va., A. Slater Clarke, Bethesda, Md., for Merchants Fund, Inc.

Paul A. Cappello, Alexandria, Va., for Charter Moving & Storage Co., Richard M. White, Jerry H. Sills, and C. J. Sills, Jr.

## MEMORANDUM OPINION

MARTIN V. B. BOSTETTER, Jr., Bankruptcy Judge.

In the instant case, the plaintiff, Merchants Fund, Inc., filed suit against Richard A. Bartl, Trustee in Bankruptcy for the bankrupts. Thereafter, the trustee brought a third-party complaint against Charter Moving & Storage Company, Inc., as well as Richard M. White, Jerry H. Sills and C. J. Sills, Jr., as third-party defendants. These latter three individuals are officers of Charter Moving & Storage Company, Inc. ("Charter"). At the request of the parties these matters were consolidated for trial.

The plaintiff's action seeks rent from the trustee from June 6, 1979 to September 30, 1979 at the rate of $2.75 per square foot per

annum. The trustee, alleging an agreement with Charter and contending that the premises were partially occupied by Charter during the period in question, seeks recovery from Charter for such possession under the agreement in the amount of $33,767.33 [1], as well as for the balance due for storage containers, and for other relief.

The plaintiff entered into three (3) lease agreements with Merchants Storage Company of Virginia, Inc. ("Merchants Storage") (two of which are pertinent to the case at bar), wherein the plaintiff leased to the latter two warehouses located at 631 South Pickett Street, Alexandria, Virginia (building 631) and 641 South Pickett Street, Alexandria, Virginia (building 641). Each of these leases was guaranteed by Merchants International, Inc. Another building, located at 520 South Van Dorn Street, Alexandria, Virginia, which is adjacent to these other buildings, also is involved in the present proceeding (building 520).

Merchants Storage failed to pay rent as required under the lease. The plaintiff, thereafter, filed for possession of both premises with the General District Court in the City of Alexandria, Virginia. The general district court entered an order on May 18, 1979 requiring Merchants Storage to surrender possession of buildings 631 and 641 to the plaintiff. Merchants Storage did surrender possession of building 631 but the plaintiff waived surrender of building 641 conditioned upon the payment of past due rent which was not paid.

Merchants Storage filed a voluntary petition in bankruptcy on June 6, 1979. Richard A. Bartl was appointed Receiver (later trustee) and took possession of buildings 631 and 641.

There are five principal issues before the Court for resolution in the case at bar. First, whether the annual rate per square foot to be charged as administrative rent against the bankruptcy estate should be $2.00 or $2.75. Second, the inclusive dates from which the stated rate will be charged against the bankruptcy estate; and the extent, if any, to which administrative rent should be assessed against Charter, et al., pursuant to the trustee's third-party complaint. Third, whether the trustee is entitled to the balance due under the July 2, 1979 contract entered into by and between the trustee and Charter. Fourth, whether the third-party defendants should be awarded judgment in the sums of $9,950.35 for Charter receivables actually received by the trustee as a result of joint billing and $25,731.75 for trash removal [2]. Fifth, whether or not Charter, et al., owe the trustee an additional $16,912.50 for storage containers acquired from the estate.

The referenced issues raised by the parties will be discussed *seriatim*.

The first issue to be addressed is the claim by the plaintiff that the fair rental value of the property exceeds the per-square-foot value set forth in the leases. The leases were entered into to commence on January 1, 1977 and to run for five years and three months from said January 1, 1977, at the rental set forth therein of $2.00 per square foot, per annum.

■ A landlord is entitled to compensation for the period during which the trustee has actual use and occupancy of the property and the expense therefor is given administrative priority. Such administrative priority must be based upon a finding by the Court that such occupancy is for the benefit of the estate and is a necessary expense

---

1. Post-trial briefs filed by the parties reveal some discrepancy as to the amount sought by the trustee. It appears from the trial record, however, that the parties stipulated in open court to the figure shown above.

2. At trial, the trustee acknowledged receipt of the $9,950.35 referred to by the third-party defendants in the counterclaim and, accordingly, adjusted his claim for the balance due on the July 2, 1979 contract to $33,767.33. The third-party defendants also have withdrawn their counterclaims for $2,500.00 for loss of use of a vehicle, and for $30,000.00 for damages suffered due to the trustee's alleged breach of the July 2, 1979 contract. At the conclusion of the third-party defendants' case, the Court granted the trustee's motion to dismiss that portion of their counterclaim alleging interference with business and loss of business in the amount of $253,480.00.

**452**

therefor. *In re North Atlantic and Gulf Steamship Company*, 166 F.Supp. 29, 31 (S.D.N.Y.1958) *affirmed sub nom. 120 Wall Associates v. Schilling*, 266 F.2d 548 (2d Cir. 1959).

■ It is not incumbent upon the trustee to pay the lease amount for such occupancy but rather the standard to be applied is "the reasonable value of the use of the premises." *In re Preisler*, 13 F.2d 116, 117 (7th Cir. 1926). In establishing a standard for determining value, great weight shall be given to the amount established in the lease and such amount "is the rent reserved in the lease in the absence of a clear showing that it is unreasonable." *In re North Atlantic and Gulf Steamship Company, supra*, 166 F.Supp. at 33.

■ In the instant case, the plaintiff-landlord offered the testimony of an expert witness who testified that he considered the fair rental value of the premises on June 1, 1979 to be $2.75 per square foot, per annum. Additional testimony was offered to show that a similar building, adjacent to the two in question, was leased in June 1979, some

2½ years after the leases in question herein, at a rental of $2.75 per square foot, per annum. Further testimony indicated that one of the buildings in question, building 641, was leased on August 30, 1979 at $2.75 per square foot, per annum. Testimony was also adduced to the effect that the lease at $2.00 per square foot, per annum, was granted by the landlord as a protection to assure repayment of certain notes in connection with the principal sale of the storage business.

Considering all the testimony of the plaintiff in its most favorable light, the Court must conclude that such testimony fails to make a clear showing that the rental value set forth in the lease of $2.00 per square foot, per annum, is unreasonable and, accordingly, therefore determines that the reasonable value for the premises during the period occupied by the trustee is $2.00 per square foot, per annum.

The Court next considers the appropriate time-frame for calculating the amount of administrative rent to be allowed with respect to buildings 631 and 641.

SCHEMATIC OF WAREHOUSE AREA, TRUSTEE'S EXHIBIT A

■ The trustee has an obligation to surrender to the landlord property which had been in possession of the debtor in an expeditious manner once the bankruptcy estate's need to occupy the same is ended. In occupying such property, the trustee is lia-

ble for administrative rent on that portion of the property being used for the benefit of the estate.

The trustee in his "Report of Receiver" suggests that the estate's occupancy of buildings 631 and 641 extended "until approximately September 15, 1979." The basis for the trustee's statement rests upon the removal of full or partially-full standard storage containers from these buildings and the subsequent disposal of trash and debris resulting from the movement of the aforesaid storage containers.

Testimony was adduced which indicated that by September 15, 1979 approximately 75 percent of the back portion of building 631 was empty and that approximately 50 percent of the front portion of building 641 was empty. The condition of the front portion of building 631 and the back portion of building 641 could not readily be determined however. On this date, Ronald Rasmus, the auctioneer for the trustee, testified that he concluded removal of trash for which he was responsible around building 641. Although a private contractor was removing trash from the premises, as indicated by trash dump tickets admitted into evidence as Third-Party Defendants' Exhibits A–H, well into October 1979, the weight of the evidence suggests that the common yard area and the buildings were in a sufficiently fit condition to permit the plaintiff to take over the premises by the middle of September.

The plaintiff is seeking administrative rent for both buildings to run until at least September 30, 1979. The plaintiff, in support of this position, maintains that there remained trash and debris on the premises which was purportedly the ultimate responsibility of the trustee to remove[3].

The trustee controverts the position taken by the plaintiff on this point inasmuch as he contends it was the sole responsibility of Charter to remove the wood and cardboard storage containers (which Rasmus was unable to sell at auction) located in the common yard area surrounding the premises. He argues that Charter was moving these storage containers at the plaintiff's request, since it was definitely in the plaintiff's interest that they be removed in an expeditious manner. Thus, the trustee asserts that as the storage containers (as well as the trash and debris resulting therefrom) had been removed from buildings 631 and 641, these premises were no longer being used for the benefit of the estate and, therefore, should be considered abandoned. The trustee relies upon *In re Furniture-in-the-Raw, Inc.,* 462 F.Supp. 958, 960 (S.D.N.Y.1979) in support of this proposition. There, the court held that:

> "The appellant's [landlord of plant leased to debtor] claims for use and occupancy of leased premises after abandonment thereof by the debtor and before disposal of abandoned personal property of the debtor are not entitled to be treated as administration claims and thus accorded priority as an expense necessary to preserve the estate within the meaning of Section 64a(1) of the Bankruptcy Act, 11 U.S.C. § 104(a)(1)."

Rather, the appellant's claim was to be considered a general unsecured claim. In the same case decided below, the bankruptcy judge stated that the debtor's liability for use and occupancy terminated when the premises were abandoned to the landlord. The court so held notwithstanding "the frightful condition of the landlord's premises caused by the wholesale abandonment of property and debris . . . ." *In re Furniture-in-the-Raw, Inc.,* 4 B.C.D. 519, 521 (Bkrtcy. S.D.N.Y.1978).

The Court, having reviewed all the evidence on this issue, finds that the plaintiff is not entitled to administrative rent for building 631 after September 15,

---

**3.** As will be discussed in detail, *infra* at p. 9, the relationship between Hite, the plaintiff and Charter is a close one. In fact, this relationship leads the Court to conclude that the plaintiff should not be heard to complain that it was without knowledge of the fact that the estate had no further use or benefit of the premises as to the full or partially-full storage containers after the July 2, 1979 contract was executed, and as to the empty storage containers placed in the common yard area after the auction sale in August 1979.

1979. With respect to building 641, the Court is aware of the trustee's statement what the estate benefited from the use of this building until September 15, 1979. The Court is also aware that the plaintiff entered into a lease agreement with Park Brothers Moving Corporation on August 30, 1979, wherein the plaintiff leased this building to Park Brothers. In light of this agreement, administrative rent for building 641 will end as of August 30, 1979.

Having established the stated rate upon which administrative rent may be assessed as well as the time frame for imposing this rate upon the estate, the Court next examines whether the trustee's third-party complaint against Charter, *et al.*, is well founded. The trustee maintains that on July 2, 1979 he contracted with Charter, *inter alia*, for the transfer to the latter of the debtor's rights and liabilities with respect to certain long- and short-term storage located in buildings 631 and 641 at the time the debtor's petition was filed. The trustee asserts that the remaining third-party defendants, Jerry H. Sills, C. J. Sills, Jr., and Richard M. White, as officers of Charter, are personally bound under the contract of July 2, 1979 (which was approved by the Court on July 3, 1979) to pay Charter's obligations thereunder.

The trustee alleges that portions of the premises containing the storage alluded to above, as well as certain contiguous space in the commons area, were, at all times after July 2, 1979, occupied and used by Charter rather than by the trustee. He seeks judgment against Charter, *et al.* for such portions of administrative rent as may be properly applied to Charter pursuant to the July 2, 1979 contract.

The terms of the contract between the trustee and Charter required that Charter purchase all the full or partially-full storage containers in buildings 631 and 641, and assume "all of the debtor's rights, liabilities, and duties in respect" thereof. Charter was also to undertake "at no expense to the Receiver" the moving of any empty storage containers in building 641. The contract anticipated that Charter would perform its duties within a two-week period. Incorporated into the contract is the statement that the trustee relied upon Charter's representations that it could "provid[e] the services and fulfill[ ] all of its obligations provided for in" the contract. (Trustee's Exhibit B at 7.)

Charter acknowledges that it was to perform the services alluded to above within the specified two-week period. However, Charter represents that a meeting held on July 13, 1979 between the trustee, Charter and other parties culminated in an oral agreement which modified the terms of the July 2, 1979 contract. The terms of this oral agreement, according to Charter, required Charter to place the storage containers outside the buildings to facilitate the auction being conducted by Rasmus. Charter, in turn, was granted a reasonable period of time beyond the two-week period specified in the earlier written contract to complete the movement of the storage containers at cost.

At trial, the trustee did not expressly controvert that a meeting had taken place between the parties on July 13, 1979 and that several matters had been resolved concerning the earlier written contract. In any event, the putative terms of this subsequent oral agreement do not, of themselves, challenge the trustee's contention that the estate's liability for administrative rent for floor space occupied by full or partially-full storage containers in building 631 ceased as of July 2, 1979. Neither does this oral agreement contradict the trustee's contention that Charter was responsible for the contents of building 641 after this date.

In further support of the proposition that his use and occupancy of a portion of the premises ended on or about July 2, 1979, the trustee asserts that during the last week of June 1979, C. J. ("Bo") Sills and Charles Hite changed the locks on building 631 and, thereafter, Sills had the only key to the building. The trustee maintains from that time forward he had no independent access to the building.

Charles Hite, formerly an officer of Charter and, thereafter, a consultant to Charter,

was in frequent contact with the trustee. Hite was also on the premises on almost a daily basis. Hite testified that at the trustee's auction (held in mid-August 1979), the wood-and-cardboard storage containers heretofore noted, received no bids and were later broken down for trash removal. Hite considered these storage containers to be trash once they were broken down and left outside of the buildings for the elements to take their toll. Hite testified further that he personally made sure that Charter personnel were working on trash removal every day.

█ There is considerable and conflicting testimony regarding the intent of the parties in arriving at the July 2, 1979 contract. Charter maintains that its responsibility under the contract was to "move" the storage containers rather than obligating it to pay administrative rent. Testimony adduced regarding the reason for Charter's delay in moving the storage containers is disputed by the parties. An objective overview of all the evidence indicates that the trustee expected Charter, being experienced in the moving business (which the trustee, by his own admission, certainly was not) to expeditiously fulfill its part of the bargain. Further, when the trustee agreed to give Charter an extension of time to complete this work, it was intended that such an extension be for a reasonable time only. The delay by Charter necessitates a finding that it should be responsible for a portion of the administrative rent.

Charter's obligation for paying administrative rent is based upon its responsibility for the condition of the commons area as well as for those portions of buildings 631 and 641 which were used as a depository for the storage containers it purchased from the trustee.

The approximate square footage for buildings 631 and 641 is 46,000 square feet for each building. Of this total square footage, the trustee maintains that Charter is responsible for approximately 45 percent of the square footage for building 631 and 50 percent of the square footage for building 641. The figure utilized for building 631 consisted of permanent storage, while that for building 641 consisted of storage in transit.

The trustee, in arriving at these figures, relied upon information supplied by Richard Freeman, an accountant variously in the employ of the trustee, the plaintiff and Charter.[4] These figures, according to Freeman, were based upon a May 1979 inventory from a log book of the storage containers indicating which were full, partially full and empty. Freeman acknowledged that, although the log book was not entirely accurate, it did give a close approximation of the types of storage containers in the building at that time.

█ In Virginia, a party need not establish the existence of damages with mathematical precision. Rather, evidence sufficient to prove damages need only be established to a reasonable certainty or a reasonable probability. Thus, facts in a particular case must be such as to allow a reasoned and well-informed estimate of the amount of damages or loss sustained. *Holz v. Coates Motor Company*, 206 Va. 894, 147 S.E.2d 152 (1966). *See Stevens v. Abbott, Proctor and Paine*, 288 F.Supp. 836 (E.D.Va. 1968).

█ As indicated above, the testimony on this point is conflicting and subject to interpretation. While Charter acknowledges that it did use some unspecified portion of the premises, it disagrees with the figures suggested by the trustee. The Court is of the opinion, however, that the trustee's approximations of the space occupied by storage containers substantially reflect the warehouse floor space used by Charter in both buildings 631 and 641. This, the Court finds, forms an appropriate basis for establishing a reasoned estimate of

---

4. Freeman was employed as an assistant to the president of Merchants from December 1978 through June 1979; by the trustee as a management consultant from June 6, 1979 through July 13, 1979; and by Charter in a similar capacity from July 20, 1979 through September 18, 1979.

Charter's use of the premises and, therefore, the allocated charges to Charter shall be 45 percent of building 631 and 50 percent of building 641.

The Court next turns to the trustee's complaint for turnover against Charter, *et al.*, wherein he seeks judgment against these parties in the amount of $33,767.33, representing the balance due the bankruptcy estate under the July 2, 1979 contract.

Charter does not dispute the accuracy of the contract balance alleged to be due by the trustee in the amount of $33,767.33, but contends instead that it is entitled to a set-off against this sum in the amount of $26,989.75 for the removal of trash either created or abandoned by the trustee.[5]

The trustee raises various assertions in support of his argument that Charter is not entitled to a set-off. Having reviewed the trustee's allegations on this point, the Court finds the following to warrant further examination. First, the trustee maintains that no party has established that the estate benefited from the removal of the empty wood and cardboard storage containers by Charter. Second, the trustee asserts that in point of fact Charter removed the aforesaid storage containers at the plaintiff's request and, furthermore, inasmuch as Charter had rented the rear portion of building 631 and building 520 from the plaintiff, these parties were working for the benefit of each other rather than that of the estate. Third, the trustee questions the validity of the labor cost figure put at issue by Charter.

Charter takes exception to the trustee's contention that the estate did not benefit from the removal of trash from the premises. Charter maintains that pursuant to the verbal agreement entered into by it and the trustee on July 13, 1979 the trustee agreed to reimburse Charter for its costs in removing the trash. The trustee acknowledges that he entered into such a verbal agreement with Charter's principals and that bills reflecting Charter's actual costs for

services rendered were to be tendered to him. Other testimony reveals that the parties later entered into a second verbal agreement on September 15, 1979 (as stated by the trustee) or on October 15, 1979 (as stated by Sills and White). The trustee testified it was his understanding of the verbal agreement that Charter would proceed with removal of the debris if the trustee would not seek immediate payment of a note due Merchants from Charter. White's recounting of his understanding of the verbal agreement alluded to the trustee's willingness to pay the labor costs while Charter was to be responsible for the dump fees.

The Court finds the trustee's testimony on this point to be credible and must conclude that the agreement did not contemplate more than a forbearance on the trustee's part in permitting Charter additional time to make the payment in question.

Although there is conflicting testimony on the question of which party benefited from the trash removal program, the Court is inclined to find that the principal beneficiaries were the plaintiff and Charter. There are several bases for this conclusion. James Ligon, the individual who hauled some thirty-two truckloads of debris out of the premises, testified that Hite (representing the plaintiff) recommended him to Sills for this job. Charter oversaw his work and paid him for his services.

The Court next notes that Charter was leasing building space on the premises from the plaintiff. Charter, in fact, does not dispute the trustee's contention that the removal of trash from the premises would be advantageous to its business position. This view is supported by testimony which indicated that until the premises were cleared of debris Charter would be precluded from obtaining storage contracts with either the federal government or with other private moving concerns.

---

**5.** As noted above, the trustee acknowledges receipt of $9,950.45 referred to in paragraph 3 of Charter's Answer and Counterclaim.

There is credible evidence in the record which indicates that much of the debris which accumulated on the premises was created by Charter in the course of its business. Therefore, Charter should bear the costs of trash removal from the premises. Both Ligon and Freeman related that a large amount of trash was generated by the storage container removal process and "delivery outs" (*i. e.*, the location of merchandise in the warehouse and its removal from the premises on moving vans). Freeman testified that only minimal trash accumulation resulted from the efforts of the trustee and his employees to auction off the estate's property.

Even if the Court was to determine that the trustee should bear a portion of the costs, exclusive of dump fees, for removal of the trash, the labor costs suggested by Charter are susceptible to challenge. Freeman, who was on the premises almost daily during the period of time at issue, testified that the five individuals employed by Charter purportedly to remove trash on a full-time basis from July 20, 1979 through October 26, 1979 made "delivery outs".

Accordingly, based upon a thorough review of the record, the Court is of the opinion that Charter is not entitled to a set-off of the $33,767.33 which it acknowledges is the balance due and owing the trustee pursuant to the July 2, 1979 contract.

█ In addition to this sum, the trustee argues that Charter is responsible for payment of an additional $16,912.50 to him for storage containers purchased but not properly counted in determining the final amount due under the aforesaid contract.

Pursuant to this contract, Charter was to purchase all the storage containers located in building 520. Relying upon the report given him by Rasmus, the trustee believed that there were but 2,436 such containers in this building and thus sold all the containers found therein at $18.75 per container. Rasmus testified that there were actually 3,338 containers in building 520 and, but for

the typographical error, would have been figured into the contract price.

The trustee confirms that there was an error in counting the storage containers to be sold to Charter by the auctioneer, Rasmus, in that he indicated in his Appraisal and Inventory (Trustee's Exhibit D) a quantity of 902 wooden storage containers were located in building 620. The location of these containers is noted as Lot 5, at page A–1, of the trustee's Exhibit D, but "5" has been superimposed over the "6" to read "520". The parties are in agreement that there is no building "620". Nor is there any dispute that Charter purchased all the storage containers located in building 520. Rasmus testified that this was a typographical error and that the 902 storage containers were actually in building 520.

Charter relies upon testimony given by C. J. Sills to the effect that building 520, when filled to capacity with uniform storage containers can hold but 2,838 containers. The Appraisal and Inventory indicates that Rasmus counted 2,436 containers in building 520 in June of 1979. For an additional 902 containers to be in this building, the Court, according to Charter, would have to make a finding that a total of 3,338 containers were located therein, which would be some 500 containers beyond the building's putative storage capacity.

The Court is of the opinion that the weight of the credible evidence supports the trustee's position as to the existence of the disputed storage containers and, accordingly, Charter, *et al.*, shall be required to turn over to the trustee an additional $16,912.50.