**In re SELVA & SONS, INC., Debtor.**

**In re SELVA & SONS MFG., INC., Debtor.**

**Bankruptcy Nos. 181–12013–21, 181–12014–21.**

United States Bankruptcy Court, E. D. New York.

July 29, 1982.

Siegel, Sommers & Schwartz, New York City, for Selva & Sons, Inc. and Selva & Sons Mfg., Inc., debtors; Harris Schwartz, New York City, of counsel.

Quint, Marx, Chill & Greene, New York City, for Metropolitan News Co.; Benjamin Hager, New York City, of counsel.

OPINION and ORDER

CECELIA H. GOETZ, Bankruptcy Judge:

Selva & Sons Mfg., Inc. ("Selva") has brought on by order to show cause an application to have its former landlord, Metropolitan News Co. ("Metropolitan"), held in contempt of Court because of its refusal to pay Selva the balance of the consideration for the sale to Metropolitan of Selva's lease. Selva urges that Metropolitan is in contempt of the order of this Court dated November 12, 1981 approving the sale of the lease to the landlord. Metropolitan has responded by requesting dismissal of the motion for contempt and by filing a cross-application in which essentially it asserts

that nothing is owed Selva; that, on the contrary, Metropolitan has been damaged by the breach of Selva's agreement in an amount which exceeds the agreed-upon purchase price. However, Metropolitan has made clear on the record that it was not seeking any affirmative relief against Selva, but was interested only in establishing that it owes nothing to the debtor.

The past proceedings in this matter are relevant to this dispute, which grows out of a terminated landlord-tenant relationship.

Selva is one of two related debtors which filed petitions under Chapter 11 of the Bankruptcy Code on June 22, 1981, and since that date have continued in control of their properties and businesses as debtors-in-possession. Whatever the hopes with which the Chapter 11 petitions may first have been filed, both companies are now engaged in liquidating their properties. On October 16, 1981, Selva filed a plan which calls for such liquidation and the subsequent distribution of the proceeds in accordance with § 726 of the Bankruptcy Code, which governs distribution in Chapter 7 proceedings. Unlike its statutory predecessor, the new Bankruptcy Code permits self-liquidation pursuant to the type of procedure that was formerly reserved for companies seeking rehabilitation.

At the time Selva filed for relief, it was occupying premises owned by Metropolitan at 47–25 34th Street, Long Island City, New York, under a ten-year lease which commenced March 1, 1976 and was due to expire on February 28, 1986. The rental beginning September 1, 1978 for these premises was $8,160 per month, or $97,920 per year. Selva was in arrears on its rent at the time it filed, or subsequently fell into arrears. Relations between Selva and its landlord, Metropolitan, had evidently been troubled for some period of time to the extent that Mr. O'Hearn, Jr., President of Metropolitan's parent, McGrath Services, Inc., took the extraordinary step of taking over personal supervision of the relationship with this tenant. Like all real estate, the premises previously occupied by Selva have risen in value so that its favorable lease constituted a possible source of funds for its creditors.

At one time, Selva contemplated assuming the lease and reselling it. When Metropolitan learned of these plans, it negotiated with Selva to buy the balance of the lease itself, and a letter agreement was entered into between the attorneys for Selva and Metropolitan. Under the letter agreement, Metropolitan agreed to pay $58,000 to Selva, $29,000 upon entry of an order approving the transaction and $29,000 "upon delivery to the purchaser of the premises, subject to the lease, free of all equipment, furniture, and machinery." The letter agreement further provided that the premises would be vacated and possession delivered within 30 days of the entry of the order approving the sale; that the debtor would continue to pay use and occupation at the rate of $8,160 per month while remaining in possession of the premises, such payments to be due from "October 23, 1981 up until possession is delivered to the purchaser"; that if such use and occupation was not paid for the period until possession is delivered, "then and in that event, the purchaser may deduct from the $29,000.00 due on delivery of possession, the amount due for use and occupation." A supplementary letter provided that the order of the bankruptcy court would provide that the lease would terminate 30 days after entry of an order ratifying the letter agreements.

A hearing was held on notice to the members of the official creditors' committee on authorizing Selva to sell its lease on the terms set forth in the letter agreement. At that hearing on November 12, 1981, the attorneys for the debtor said, *inter alia*, that the landlord was to have the right on delivery of possession to deduct from the $29,000 to be paid on such delivery whatever was due at that time for unpaid use and occupation. The attorney for the debtor explained that it would not be possible to vacate the premises any earlier than December 18, which would extend the period of occupancy to 36 days after the entry of the order, rather than 30 days as required under the letter agreement, but he under-

took to "guarantee the landlord we will be out by December 18." He said that the offer had been discussed with the creditors' committee; he recommended acceptance of Metropolitan's offer because the debtor would be excused from paying arrearages in rent amounting to approximately $35,000 and would, in addition, receive $58,000.

The Court then inquired as to why the debtor would be unable to get out within 30 days, to which the attorney for the debtor replied:

"Well, we have to remove the equipment and the inventory and we don't know how long it will take. Mr. Koppel, who is buying the equipment, has asked to have it until the 18th. However, the debtor has discussed that with him and informed him that we would like it out, as soon as possible. He has consented, today, to go to the premises and start working on it today. We may be out before the 18th, I'm not saying we won't be, but we may need it, your Honor. Under those circumstances, I don't think that it is unfair to ask for an extra six days, with the understanding to the landlord, once again, that we will remove ourselves, as soon as possible."

The attorney for Metropolitan made it plain that he wanted assurances that the removal of equipment would not result in damages to the premises, and that the $29,-000 payment would be made only if there were no damages and the premises were delivered "clean, broom-clean and vacant." He also stated that he believed the value of the premises to be greater than the rent reserved under the lease, and that the landlord would not be bound under its letter agreement to any specific rental under the old lease for the six days Selva wanted to hold over. However, Metropolitan ultimately consented to December 18, 1981 as the final date, provided that the order included a provision of set-off for any unpaid use and occupation and for any damages resulting from the removal of equipment. The order which the debtor had submitted was modified to provide that "the remaining $29,000.00 to be paid upon delivery of

the premises to the purchaser less any use and occupation due from October 23, 1981 and less damages resulting from removal of the equipment and machinery." The order further provided that the lease between Selva and Metropolitan was to terminate 36 days from the entry of the order, which itself was signed on November 12, 1981.

Sometime prior to the auction of all Selva's equipment on December 9, 1981, Selva wrote Metropolitan purporting to set forth an understanding between them that all of the lighting fixtures, "together with all electrical cable and conduit and all metal and glass partitioning shall be the property of Metropolitan News and shall not be sold and/or removed."

The lease itself provides that all fixtures and like installations installed in the premises become the property of the landlord, "unless Landlord, by notice to Tenant no later than twenty days prior to the date fixed as the termination of this lease, elects to have them removed by Tenant, in which event, the same shall be removed from the premises by Tenant forthwith, at Tenant's expense." (¶ 3.) The lease also gives the landlord the right during the last six months of the term to enter the demised premises for the purpose of showing the same to prospective tenants (¶ 13).

On December 18, 1981, the day the lease expired under the terms of the letter agreement approved by the Court, Metropolitan memorialized in a letter that Selva had agreed to remove studs and electrical conduit on the floor space and patch the holes left; to remove the electrical wires hanging down from the light fixtures; to remove all rubbish, lumber, and other material, "leaving the space open and broom clean by 6:00 P.M. * * * December 23." The letter further noted that Selva had agreed to deliver the keys to Metropolitan on December 23, 1981. Although Selva did, in fact, turn over the keys to the premises to Metropolitan's superintendent on December 23, 1981, the place was not broom-clean until January 15, 1982.

From December 23, 1981 to January 15, 1982, Selva had men working on the premis-

es removing the extensive electrical cable and conduits previously used in their manufacturing operations. Selva was impeded in cleaning out the premises by the difficulty in getting large containers due to the garbage strike, although that strike had terminated prior to December 23, 1981. Another problem which Selva encountered was that during one working day, the elevator, which under the lease it was entitled to use, broke down and it was unable to get permission to use the other freight elevator.

Metropolitan, through its superintendent, monitored the progress Selva was making in vacating the premises, and also took action to protect the property when removal of air-conditioners and of a ventilating system permitted the elements to enter, threatening damage to the property. The landlord sent in its own workmen to close up the outlets.

During the period from December 23, 1981 to January 15, 1982, the landlord did not show the premises to anyone because of their condition, and because Selva was still carrying on this clean-up work which embraced shelving, cartons, skids, machinery, desks, office chairs, boxes of phonograph records, and ballet music.

After Metropolitan began showing the premises subsequent to January 18, 1982, it was able to lease them in May, 1982 at a price of approximately $325 per square foot, or $245,000 per year, such rental to start September 1, 1982.

On January 22, 1982, Metropolitan tendered Selva $3,530.61 as the balance due it. This sum was based on deducting from the $29,000 otherwise due Selva an amount labeled "Rent" for the period from October 23, 1981 through January 15, 1982, and a charge for gas and electricity for the period beginning September 8, 1981 and terminating January 15, 1982. These sums totaled $25,469.39, leaving a balance due of $3,530.61. Selva refused to accept this figure, and brought on the present order to show cause. According to Selva's calculations, the sole permissible deductions against the balance due are for use and occupation up through December 22, 1981

(or $16,320), plus gas and electricity for the same period ($1,700), leaving a balance due of $10,980. In response, Metropolitan filed an affidavit reciting that the balance due was only $3,530.61, which sum had been previously tendered the attorneys for the debtor, and requested that the motion for contempt be dismissed. In a cross-application, Metropolitan claimed damages from the debtor for breach of the agreement to vacate the premises on December 18, 1981 on two alternative theories: (1) the difference between the rent reserved under the lease and the fair market value of the premises; or (2) the portion of the premium paid by Metropolitan to Selva for vacating the premises allocable to the hold-over period.

### DISCUSSION

One source of the problems in resolving this dispute is that what has occurred here is that an arrangement which was approved by the Court was modified by the parties directly concerned without regard to the possible prejudice to the creditors in this proceeding. Neither the Court, nor the creditors, were apprised at the hearing approving the sale to the landlord of the lease that what was involved in the undertaking to leave the premises "broom-clean" was work of such magnitude that it would require better than three weeks to complete. When the creditors raised no objection to the proposed agreement, and when the Court approved it, it was on the basis of statements by the debtor that the maximum deduction for use and occupancy would be for a period terminating no later than December 18, 1981. Had the debtor made it plain that it intended to assume obligations of the landlord which would give rise to a claim against it for use and occupation for an additional 18 days, or $6,000, the creditors might well have insisted upon continuing to search for a more profitable disposition of the lease. On the other hand, it is clear that the landlord did not get the result for which it had bargained: it had undertaken to pay a substantial sum to Selva in return for Selva's as-

surance that it would vacate the premises by a fixed date, and at the very latest by December 23, 1981. Instead, full possession was not given back to the landlord until January 15, 1982. By retaining possession of the premises, Selva made itself liable for payment for use and occupancy. This is not a case where an odd piece of furniture remained at an otherwise unutilized premises (*In re North Atlantic & Gulf Steamship Co., Inc.*, 166 F.Supp. 29, 31 (S.D.N.Y.1958), aff'd sub nom. *120 Wall Associates v. Schilling*, 266 F.2d 548, 550 (2d Cir. 1959)); although Selva was not using the premises for manufacturing, Selva's occupancy was entire.

The general rule "for determining the reasonable value of the use and occupancy of premises by a trustee is the rent reserved in the lease in the absence of a clear showing that it is unreasonable." *In re North Atlantic & Gulf Steamship Co., Inc., supra*, 166 F.Supp. at 33; *see also S&W Holding Co. v. Kuriansky*, 317 F.2d 666 (2d Cir. 1963); *In re Merchants Storage Co. of Va., Inc.*, 15 B.R. 448, 452 (Bkrtcy.E.D.Va.1981). There is evidence in this case that the reserved rent is less than the reasonable value of the premises. However, the landlord, in its communications with Selva, has consistently taken the position that the amount due for continued occupancy by Selva, as distinguished from damages to the landlord from such occupancy, is the rent reserved under the lease. Under the order approving sale of the lease to Metropolitan, Selva is obligated to pay "use and occupation due from October 23, 1981," which in context means the rental fixed by the lease since all parties were in agreement that at least up until December 18, 1981, that was the amount intended. Therefore, under all the circumstances of this case, it is the view of this Court that Selva is obligated to pay for use and occupation at the rate fixed in the lease.

Under Selva's lease, it was also obligated to pay for water and sewer charges. Selva, in its correspondence with the landlord, has conceded liability for $1,700 to cover such charges.

Metropolitan, which originally was willing to pay over to Selva the difference between the balance due Selva and the amount due Metropolitan on account of Selva's occupancy up to and including January 15, now takes the position that nothing is due because Metropolitan has been damaged by Selva's continued occupancy and that it was unable to relet the premises, or even show them to potential lessees.

For several reasons, the Court rejects Metropolitan's contentions. First, it is most debatable whether Metropolitan, in fact, suffered any monetary damage due to Selva's tardiness in vacating the premises. No lessee was actually excluded from possession; Metropolitan did not re-rent the premises for several months. Under the lease, Metropolitan was free to show the premises, even during Selva's tenancy. If Metropolitan elected not to exhibit the premises during the period that Selva was engaged in moving out, the fault cannot be laid at Selva's door. Second, the actual party in interest here is not Selva, but its creditors. The arrangement with the landlord was approved by the Court after a hearing, at which it was clearly understood that Selva's obligation in remaining on the premises was to be limited to payment for use and occupancy. It is true that no one contemplated an extension of Selva's occupancy of the character that actually took place, but that was the result of an arrangement between Selva and the landlord, which never was submitted to the Court, nor received its approval. In the context of this proceeding, with Metropolitan having established no actual damage, and it being Selva's creditors who actually will be out-of-pocket for any damages allowed Metropolitan, it seems to this Court inappropriate to reduce the amount payable to Selva for a substantial asset because of such theoretical damage.

It should be noted that the landlord has received substantially the asset for which it bargained, which is the termination of a lease favorable to the tenant and unfavorable to itself, which Selva could have sold on terms that might have been more favorable

than what it now appears it will receive from Metropolitan.

In sum, Selva is entitled to the difference between $29,000 and what it owes for use and occupancy under the lease up to January 15, 1982, $22,637, plus $1,700 for sewer and water charges. No further deduction will be allowed for any damages due to Selva's continued occupancy from December 23, 1981 to January 15, 1982.

Since the landlord essentially offered Selva what the Court deems to be what is owed Selva, it follows that it at no time has been in contempt of this Court, but that its actions have been totally consistent with the Orders of this Court. Accordingly, Selva's application is denied, provided that no later than ten days after the Order of this Court in this matter becomes final, Metropolitan pay Selva the amount of $4,663.

SO ORDERED.