In the Matter of NORTHWEST ENGINEERING COMPANY, Debtor–Appellant,

v.

United Steelworkers of America, Appellee.

No. 88–1489.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 28, 1988.

Decided Dec. 7, 1988.

R. Arthur Ludwig, Ludwig & Shlimovitz, S.C., Milwaukee, Wis., for debtor-appellant.

Miriam R. Horwitz, Zubrensky Padden Graf & Maloney, Milwaukee, Wis., for appellee.

Before CUDAHY, POSNER, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Firms often require their employees to work a full year to accumulate vacation time that can be enjoyed the next. Northwest Engineering Co. used that system. Employees who worked a minimum number of hours in one calendar year (the work requirement) and one day in the next year (the vesting requirement) became entitled to a paid vacation (or cash in lieu of leave) during that year. The length of the vacation depended on the number of years the employee had been with the firm and the number of hours worked in the accumulation year; these details are unimportant.

Northwest filed a petition in bankruptcy on April 1, 1983, and laid off 116 employees. The firm paid all wages due, but most of these employees also are entitled to vacation pay on account of work performed in 1982. The firm acknowledges the obligations, aggregating $258,000, but wants to treat vacation pay as general unsecured debt. Unsecured creditors of the firm, which remains in business, will receive some cash plus equity under the approved plan of reorganization. The former employees prefer all cash. They contend that the vacation pay should be paid before other debts because of 11 U.S.C. § 507(a), which provides:

The following expenses and claims have priority in the following order:

.　　.　　.　　.　　.

(3) Third, allowed unsecured claims for wages, salaries, or commissions, including vacation, severance, and sick leave pay—

(A) earned by an individual within 90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first; but only

(B) to the extent of $2,000 for each such individual.

Section 507(a)(3) gives a priority to vacation pay "earned" within 90 days of the bankruptcy, and each side plays on this word. Northwest observes that the vacation pay in question depends on work done in 1982. The collective bargaining agreement says that "[v]acation granted in this Agreement will be earned in the year prior to the year in which taken." Vacation therefore was "earned" in 1982, Northwest submits, and none qualifies for priority distribution since the firm filed the bankruptcy petition more than 90 days after the end of 1982. The employees reply that their entitlement to vacation pay depended on working at least one day in 1983, and they submit that all of the vacation pay was "earned" for bankruptcy purposes on that day of vesting, within the 90-day period.

The bankruptcy judge bridled at this all-or-nothing choice. "Earned" is a statutory term, the court noted, which may not be defined by contract. Congress gave priority to 90 days' worth of vacation pay, and the bankruptcy court therefore treated one-fourth of the 1982 vacation pay as a debt covered by the third priority. The district court reversed. Believing that the parties' options are the only possible ones—because either the whole amount was "earned" early in 1983 when the right to receive vacation pay vested, or none was "earned" in 1983—the district court concluded that the employees' position better fits the language of § 507(a)(3). This wrapped up the last remaining issue in the bankruptcy case, leaving nothing but distribution. The order is therefore "final" for purposes of appellate jurisdiction under 28 U.S.C. § 158(d).

"Earned" could take any of at least four meanings. (i) Vacation pay may be earned as work is done, with or without regard to the vesting rules in a given firm's contracts. (ii) Vacation pay may be earned as work is done, but only if the right to receive pay has vested (that is, if there is a contractual debt). (iii) Vacation pay may be earned on the day the right to receive it vests. (iv) Vacation pay may be earned on the date payment is due. The choice is easy if vacation pay accrues so many hours

per week or month, for then it vests as soon as the work is done and is due on demand; the definitions coalesce. This is a common method of awarding vacation pay —treating vacation pay as no different in principle from an immediately-available bonus on wages—and must have been the model on which § 507(a)(3) was based. The statute uses a single word, "earned", to refer to wages and vacation pay, and the continual-accrual method, which the national government uses for its own employees, is well known in Washington. No legislative history suggests a different meaning of "earned". Indeed no legislative history suggests any meaning of "earned". The committee reports and other material relate only that the maximum priority amount has been raised and that vacation pay has been expressly included with wages; everyone assumed that "earned" has an obvious meaning. S.Rep. 95–989, 95th Cong., 2d Sess. 69 (1978); H.R.Rep. 95–595, 95th Cong., 1st Sess. 357 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

What, then, is to be done when the employer separates work from vesting, which the drafters assumed are one? The structure of the statute suggests treating "earned" as a work rather than a vesting requirement, parallel to the treatment of wages. This eliminates possibility (iv), for ordinary wages are earned before payment comes due, and a firm can't avoid its obligations by closing its doors the day before payday. A fundamental principle of bankruptcy law disposes of possibility (i), if it means disregarding the contractual terms for the creation of a debt: the bankruptcy case is a collective proceeding to settle the rights of creditors. The bankruptcy court starts with obligations under state law, *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), before deciding where the obligation stands in the queue. If there is no debt (because an event essential to liability never took place), then there is nothing to which a priority can attach. "When there is not enough to go around, the bankruptcy judge must establish priorities and apportion assets among creditors with the same priority, but the starting point is legal entitle-ments that exist outside of bankruptcy." *In re American Reserve Corp.*, 840 F.2d 487, 489 (7th Cir.1988). See also *Division of Labor Law Enforcement v. Sampsell*, 172 F.2d 400, 402 (9th Cir.1949) (no entitlement to vacation pay if the business closes before the vesting date). Cases such as *In re Stunzi, U.S.A., Inc.*, 7 B.R. 401, 404 (Bkr.W.D.Va.1980), which give a priority to vacation pay when the firm closes after some work has been done but before the right to vacation pay vests, on the ground that "[t]his is a court of equity", are unpersuasive because bankruptcy law does not create debts.

In choosing among the remaining possible definitions, we attempt to conform with the treatment given to similar problems in bankruptcy law and to avoid drifting too far from the principal function of § 507(a)(3)—to assure employees that they will be paid at least $2,000 for their last days of work at the firm. If employees were treated in all respects as unsecured creditors, they would be inclined to desert a leaky ship, speeding up the firm's collapse; other creditors might be inclined to propel the firm into bankruptcy on the day before payday, obtaining greater security for themselves (and producing substantial hardship for the employees, who unlike creditors with diversified portfolios of loans may have no other source of income).

Two analogous situations are instructive. One is the treatment of vacation and severance pay as an administrative expense. The day of vesting may precede or follow the petition in bankruptcy. If it follows the petition, the employees are sure to contend that they are entitled to 100¢ on the dollar on the ground that vacation pay is a first-priority administrative expense, see 11 U.S.C. § 507(a)(1). Administrative expenses include "wages, salaries, or commissions for services rendered after the commencement of the case". 11 U.S.C. § 503(b)(1)(A). If vacation and sick pay, bonuses, and the like are "earned" on the day of vesting—and if "services [are] rendered" on that date—then the full amount of the pay is an administrative expense. It would come ahead of all other debt, includ-

ing the claims of secured creditors, even though much of the vacation pay or bonus represents a deferred payment for work preceding the petition. Courts routinely conclude, however, that vacation pay and bonuses may be paid out as administrative expenses only to the extent they reflect work done after the commencement of the case. E.g., *In re Amarex, Inc.*, 853 F.2d 1526 (10th Cir.1988); *Straus–Duparquet, Inc. v. Local No. 3*, 386 F.2d 649 (2d Cir. 1967).

A second related problem is the treatment of vacation pay under § 507(a)(3) when vesting comes after the bankruptcy. Take the facts of *United States v. Munro–Van Helms Co.*, 243 F.2d 10 (5th Cir.1957). The contract provided that the right to receive vacation pay vested on July 1, and the firm closed its doors on June 30. (Since the firm was defunct, there was no subsequent work and no administrative priority for vacation pay.) The debtor's plan—unlike that of Northwest Engineering—did not require the employees to work on or after the vesting date, so that an employee on layoff nonetheless could acquire a legal entitlement to vacation pay. If vacation pay is "earned" on the vesting date, then no vacation pay is earned in the 90 days preceding it, and so none was entitled to the priority under the predecessor of § 507(a)(3). The Fifth Circuit distinguished, however, between the vesting requirement and the work requirement. Vesting is essential to the existence of a debt, and addressing this requirement the court remarked that "[t]he rights of the employees ... were conditional, contingent or inchoate prior to July 1. On that day their rights became unconditional and absolute and these rights then accrued." 243 F.2d at 13. So there was a debt.[1] But when had the pay been "earned"? The court remarked that "it is wages which are earned and the right to receive them which accrues." *Id.* at 12. Vacation pay was "earned" continuously as work was done, even though the right to receive a year's worth "accrued" on a single date. Consequently "the vacation pay of those entitled to it under the contract constituted wages earned over the period of a year but such wages are entitled to priority only to the extent of one-fourth of the annual vacation pay." *Id.* at 13. See also *Division of Labor Law Enforcement.*

The parallel to the treatment of vacation pay for administrative priority, the parallel to the treatment of vacation pay with vesting after the date of bankruptcy, and the aim of § 507(a)(3) all point to separating the work requirement from the vesting requirement. The vesting rules determine whether there *is* a debt; if there is, the timing of the work determines "earning" for purposes of § 507(a)(3). Yet this approach, so apt in *Munro–Van Helms*, seems to lead straight to Northwest Engineering's conclusion here: because the work needed to qualify for vacations in 1983 occurred in 1982, no vacation pay was "earned" within 90 days of bankruptcy. That conclusion surely would defeat the function of § 507(a)(3) by denying the employee any return on the portion of the work in the last 90 days that was going toward the vacation pay entitlement. If forced to choose between that outcome and the district court's, we would pick the latter.

We are not forced to choose, however. It is congruent with the resolution of related problems, and consistent with the function of § 507(a), to hold that vacation pay is "earned" continuously. During January to March 1983, the employees of Northwest Engineering "earned" three months' vacation pay, because they did the work required for that boon. True, the entitlement to receive vacation for work in 1983 would not vest until 1984—and for these 116 employees it never did vest, because they

---

1. The district court and the employees rely on the discussion of accrual in *Munro–Van Helms* for the proposition that pay is "earned" when the right to receive it accrues, without noticing that the Fifth Circuit drew a line between "accrual", which defines a debt, and "earning", which depends on the work done. Judge Pol-

lak's opinion in *In re Crouthamel Potato Chip Co.*, 52 B.R. 960, 965–66 (E.D.Pa.1985), like *Munro*, is concerned with the relation between accrued rights and the existence of a debt that would become payable after the date of bankruptcy.

were gone. Northwest Engineering nonetheless owed them a year's vacation pay (less any taken before April 1, 1983). The question is how much of this acknowledged debt is to be paid at the third priority. Section 507(a)(3) sets up a measuring rod—90 days' earnings—without implying that the acts of the 90 days before the petition establish a debt. If the employee works during that time but the firm is not indebted to him—perhaps because the firm has paid him already, perhaps because a condition subsequent such as a vesting rule is never satisfied—then there can be work without a debt, and hence no priority. So, too, there can be a priority without a new debt, just so long as the firm is indebted to the worker in that amount or more. In other words, the debt can come from the 1982 vacation pay, and the measure of priority can come from the work done in the 90 days before the bankruptcy. This approach leads to a sensible outcome, in accord with the statute's goal: the employee gets a priority equal to the value of services rendered in the 90 days before bankruptcy.

Doubtless the approach has a jerry-built look, but it is difficult to see how any of the alternatives could be better. The employer's proposal sends workers away empty-handed even though the firm owes a year's vacation pay as a debt, and even though the employees built up more (potential) entitlements in the 90 days before the filing. Employees on vacation between March 15 and April 1 would not receive their last pay check (because that pay had been "earned" in 1982), while employees who worked those weeks would be paid or have a third priority claim. The employer's approach gives firms an incentive to defer filing for bankruptcy until 90 days after the vesting date, for doing so cuts off the employees' claims. Vacation pay can be a significant claim against the firm (the vacation pay claims come to about 6% of Northwest's total debt), giving other creditors reason to delay to the workers' disadvantage. Even if employers and creditors do not behave strategically, the employer's proposed rule gives workers much less, on average, than 90 days' priority. If a petition on one date is equally likely as a petition on another, then ¾ of all petitions will be filed after March 30, and employees will get no priority for vacation pay. In the remaining ¼ of cases, employees will obtain, on average, a priority for 45 days of pay. (Employees of all firms taken together, then, would receive on average about 10 days' vacation pay as a priority.) On the employer's approach, a filing on March 30 would yield priority for a single day's pay, a filing on March 29 for two days' vacation pay, and so on.[2] No conceivable function would be served by such a treatment. Both the divergence between this result and the aim of the statute, and the incentives the rule would create for strategic conduct, are sufficient reasons to reject it.

The employees' preferred position, which the district court accepted, is slightly preferable but not much so. In today's case, the rule "Treat vacation pay as earned on the date the entitlement to receive it vests" gives the workers a priority for 365 days' vacation pay. If Northwest Engineering had filed its petition on April 15 rather than April 1, however, the rule would give the employees nothing—for the vesting date (and hence the date on which 100% of the vacation pay was "earned") would have come more than 90 days before April 15. The rule could give employees of firms taken together priority for an average of 91 days' vacation pay: in ¾ of the business failures (those with petitions after April 1) the employees would get no priority, and in ¼ of the failures the employees would get 365 days' priority.[3] This would be fine

---

**2.** In this and other examples we assume that all vacation benefits vest on January 1. Many firms, like the employer in *Munro–Van Helms*, have a different fiscal year, and so a different vesting date. None of the illustrations depends on this. One may simply read for March 29, "88 days after the vesting date", and so on.

**3.** Counsel for the employees suggested at oral argument that the workers should get either the full year's priority or 90 days' priority, whichever is greater. No consistent theory supports this position, however. If everything is "earned" on the vesting day, supporting the full year's priority here, then there is no basis for treating vacation pay as "earned" when the

on average—other creditors' claims are subordinated to the extent Congress anticipated, and workers as a group get the priority Congress planned—but it is wrong in *every* individual case. Workers do not have diversified portfolios of employment. One business failure is all they care about. They want to receive their entitlements today and are not mollified by the fact that missing the mark in 100% of the cases will produce the correct average as other creditors see things.

Too, the rule the district court applied creates a strategic incentive in the same direction, but greater in magnitude, than the employer's favored rule. Waiting a single day can have large consequences. Employers and their creditors will be tempted to wait until April 2 or later to file their petitions, if they know that by waiting they can demote the priority of what may be (and in this case is) a substantial debt for vacation pay. If creditors wait, then more than ¾ of business bankruptcies will be filed after April 1, and employees will receive on average less than 90 days' worth of priority for vacation pay. Probably a good deal less, because we have reckoned so far without the effect of § 507(a)(3)(B), which limits the priority to $2,000. An entitlement to a year's priority in a quarter of the cases, and no priority in the rest, averages out to 90 days' worth only if the employee receives the whole priority whenever it is available. This won't happen; the $2,000 limit will prevent it. Suppose firms owe employees, on average, two weeks'

wages and three weeks' vacation pay when they file for bankruptcy. Five weeks' pay exceeds $2,000 whenever the annual wage exceeds $20,800—in other words, for a majority of industrial employees. Employees with higher wages (or more weeks of pay in arrears) will find the full year's priority useless to them. If, however, every employee is entitled to a priority for two weeks' wages and four days' vacation pay (a quarter of an annual accumulation), the $2,000 limit will impose a ceiling only if the annual wage exceeds $37,143, a significantly smaller fraction of workers.

In the end, we must choose among unsatisfactory options. The employer's option is unsatisfactory because it almost never gives employees a full 90 days of priority, because it gives them on average only 10 days' priority, and because it creates unacceptable incentives for strategic conduct. The employees' option, which the district court chose, is unacceptable because it gives employees a year's priority or none, missing the statutory mark in every case; because given the $2,000 limit even the average priority will be less than 90 days' worth; and because it, too, creates opportunities for strategic conduct. The option of awarding 90 days' priority in every case is jarring because it sets up a disjunction between the debt (which may be attributable to work done more than 90 days before the filing) and the standard of priority (which depends on the work done in the last 90 days).[4] But of these unsatisfactory

work is done in the event the filing comes more than 90 days after the vesting day. Moreover, a rule that gives 365 days' worth of priority in ¼ of the cases, and 90 days' worth of priority in the rest, produces an average of 159 days' priority in bankruptcies taken as a whole, close to twice the amount of subordination for other creditors that Congress provided. We discard this possibility without further ado. The employees' position remains an all-or-nothing-at-all rule.

**4.** One spot in which the disjunction may become evident is the treatment of changing levels of accrual. Suppose an employee accrues two hours of vacation pay per week until he has been with the firm five years, then starts to accrue three hours per week. A logical implication of our approach is that an employee whose rate of accrual increases between the vesting

date and the bankruptcy date had "earned" vacation pay at the new, higher level. Thus 90 days' earnings at the 1983 rate may be greater than 90 days' earnings at the 1982 rate, and the employee's priority will apply to more than ¼ of the vacation pay debt attributable to work in 1982. This is not, however, so odd as it seems. A system in which vacation pay accumulates and vests week-by-week has exactly the same effect: the employee's preference under § 507(a)(3) depends on the most recent (and highest) rate, rather than on the average rate of accumulation in the preceding year. So too with differences in the rate of pay. Vacation pay must be cashed out at the hourly rates prevailing at the time of bankruptcy, rather than the rates prevailing before the vesting date. This, too, is endemic to priorities for vacation pay, and there is an identical effect under both the employer's proposed rule and the rule

choices, the least bad is the one divorcing the work requirement from the vesting requirement, exactly as the Fifth Circuit did in *Munro–Van Helms*.

Vacation pay is "earned" continuously as work is done. The worker receives third priority treatment for benefits "earned" in the 90 days before filing—provided always that the employer is indebted to the worker in at least this sum, a question that depends on the contract and state law. The debt in this case is conceded; only the priority is debated. That priority is, as § 507(a)(3) provides, for 90 days' worth of vacation pay.

REVERSED AND REMANDED.

adopted by the district court (the full year's vacation pay that depended on work in 1982 would be paid at 1983 hourly rates).