In re OLD ELECTRALLOY CORPO-
RATION, f/k/a and f/d/b/a Elec-
tralloy Corporation, Debtor.

Richard W. ROEDER, Trustee, Movant,

v.

UNITED STEELWORKERS OF
AMERICA, Respondent.

Bankruptcy No. 91–00062E.
Motion No. 92–32.

United States Bankruptcy Court,
W.D. Pennsylvania.

Dec. 30, 1993.

**122**

Richard W. Roeder, Titusville, PA, trustee and pro se.

Mark T. Wassell and Guy C. Fustine, Erie, PA, for trustee.

Joseph Lurie and Robert T. Murphy, Philadelphia, PA, for United Steelworkers of America.

## OPINION [1]

WARREN W. BENTZ, Bankruptcy Judge.

### Introduction

Old Electralloy Corporation f/k/a and f/d/b/a Electralloy Corporation ("Debtor") operated as a specialty steel manufacturer with plants located in Oil City, Pennsylvania, Kokomo, Indiana and Frazier, Pennsylvania. The Debtor acquired the Bishop Tube facility ("Bishop Tube") in Frazier, Pennsylvania in December, 1989. The United Steelworkers of America ("USWA") is the collective bargaining representative of the union employees at Bishop Tube.

On January 22, 1991, the Debtor posted a TERMINATION NOTICE to its Bishop Tube employees announcing that at the close of business on that date, Bishop Tube would cease operations. The Debtor filed its voluntary Petition under Chapter 7 of the Bankruptcy Code on January 29, 1991. Richard W. Roeder, Esq. ("Trustee") serves as bankruptcy trustee.

Presently before the Court, after an evidentiary hearing, are the Trustee's objections to claims which the USWA filed on behalf of its members. The Trustee has no objection to Claim numbers 395 and 719 which assert claims for postpetition administrative wages. Claim number 764 is an amended claim filed in lieu of and superseding Claim number 598. Thus, claim number 598 is disallowed. The focus of this proceeding is on the Trustee's objections to USWA Claim numbers 394 and 764.

Claim number 394 asserts priority and non-priority claims for vacation pay. The Trustee previously filed Motion No. 91–1908 which sets forth the Trustee's analysis of the amount due employees for vacation pay. The Trustee objects to Claim 394 to the extent that it is inconsistent with the Trustee's analysis. At issue is the appropriate method to calculate the vacation pay claims which requires an interpretation of the provisions of the collective bargaining agreement between the Debtor and the USWA.

Claim number 764 asserts a claim for payment under the provisions of the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101 et seq. The Trustee asserts that the Debtor has no liability for violations of the WARN Act; that the required number of employees were not affected; that the Debtor qualifies for the "faltering company" exception or the "unforeseeable business circumstances" exception to the WARN Act; and that if the Debtor has any liability under the WARN Act, the Debtor's good faith belief that its actions did not violate the WARN Act merits mitigation of any penalty imposed.

### Issues

1. Whether the Debtor incurred a liability under the WARN Act upon the closing of the Bishop Tube facility.

2. What is the appropriate method to use for calculation of vacation pay due the former employees of Bishop Tube.

### I. WARN Act Claim

#### A. Statute

The WARN Act requires employees of 100 or more full-time employees to give at least

---

**1.** This Opinion constitutes this Court's findings of fact and conclusions of law.

60 days' advance notice of a plant closing if the shutdown results in an employment loss at a single site of employment during any 30 day period for 50 or more employees excluding any part-time employees. 29 U.S.C. § 2101 et seq. A part-time employee is defined as one "who is employed for an average of fewer than 20 hours per week or who has been employed for fewer than 6 of the 12 months preceding the date on which notice is required." 29 U.S.C. § 2101(a)(8).

An employer is excused from the 60 day notice requirement "if as of the time that notice would have been required the employer was actively seeking capital or business which, if obtained, would have enabled the employer to avoid or postpone the shutdown and the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business." 29 U.S.C. § 2101(b)(1). An employer is also excused from the 60 day notice requirement "if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2). An employer relying on 29 U.S.C. § 2102(b)(1) or § 2102(b)(2) is required to "give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period." 29 U.S.C. § 2102(b)(3).

### B. 50 Employees

■ In April, 1989, in anticipation of its purchase of Bishop Tube, the Debtor was involved in the negotiations with the USWA over the terms of a new collective bargaining agreement which would remain in effect when the purchase was consummated in December, 1989. When the Debtor purchased Bishop Tube in December, 1989, it hired the employees who were currently working. The Debtor made no commitment to hire former employees who had been laid off prior to the purchase date. It did agree, however, that if any of the former employees were hired, to allow some minimum vacation allowance based on previous service.

There is no dispute that the Debtor employed in excess of 100 employees at its three facilities. It is disputed that the shutdown of the Bishop Tube facility resulted in 50 or more employees suffering a loss of employment. The Debtor closed Bishop Tube on January 22, 1991. Under the WARN Act, a notice was due sixty days prior to the closing on or about November 22, 1990. Therefore, any employee hired after May 22, 1990, six months prior to the notice date, worked fewer than 6 of the 12 months preceding the notice date and is considered a part-time employee and is not included in making a determination of whether 50 employees suffered an employment loss as a result of the shutdown of Bishop Tube.

The USWA filed a Motion for Summary Judgment during the proceeding. Attached as Exhibit B to the USWA's Motion for Summary Judgment is a list of employees which the USWA received from the Trustee in response to discovery requests. In the Motion for Summary Judgment, the USWA relied on the list, asserting that the list on its face indicates that at least 50 employees were affected. The list actually shows 67 employees.

Exhibit B fails to provide the required proof that 50 employees were affected. On Exhibit B, 15 of the 67 employees listed were hired after May 22, 1990 and are thus part-time employees, not counted for purposes of the WARN Act. One employee voluntarily terminated his employment on November 2, 1990 and 5 others did not suffer employment loss during the 30 day period surrounding the January 22, 1991 date when Bishop Tube closed. One was laid off on April 30, 1991, one on May 10, 1991 and three on October 7, 1991. Exhibit B therefore shows that only 46 (67–15–1–5) persons lost employment at Bishop Tube during any 30 day period.

At trial, the USWA produced the testimony of Thomas Reck ("Reck"), an employee of the Debtor who also served as Chairman of the grievance committee, Chairman of the negotiating committee, and trustee for the USWA. Reck, in contradiction to his Affidavit attached to the USWA's Motion for Summary Judgment, which stated that the allegations contained in the Motion for Summary Judgment were true and correct, testified that certain of the hire dates shown on Ex-

hibit B as being after May 22, 1990 were incorrect and that, in fact, certain of those employees were hired years earlier. Reck testified that he assumed and relied upon the hire dates as shown on Exhibit B as being correct and did not realize that they were in error until the date of trial. During the trial, the USWA introduced Exhibit D on which Reck had, without records, from memory, made corrections to the hire dates. At the conclusion of the trial, the number of affected employees remained unclear. We afforded the USWA an opportunity to submit a corrected schedule of hire dates with supporting affidavits which the USWA filed on March 12, 1991.

The corrected schedule of hire dates lists 58 affected employees entitled to notice. Of those 58, 7 had been listed by the Trustee and by the USWA on Exhibit B as having been hired after May 22, 1990 and are now listed with hire dates which predate the Debtor's purchase of Bishop Tube. During trial, Reck testified that most of the employees had been laid off by the prior owner, Christiana Metals, at one time or another. The USWA offers no evidence as to whether these 7 individuals were working at the time of purchase by the Debtor in December, 1989 or whether they were subsequently hired by the Debtor. However, attached to the Trustee's post-trial brief are copies of the Group Insurance Enrollment and Record Form for each of these 7 employees which clearly show the date hired/rehired as the same date which appears on Exhibit B, dates which are subsequent to May 22, 1990. Thus, we find that those 7 employees were employed by the Debtor for fewer than 6 of the 12 months preceding the date on which notice was required and are therefore part-time employees within the meaning of the WARN Act and are not counted in determination of whether 50 employees suffered a loss of employment upon the closing of Bishop Tube.

Further, the corrected schedule of hire dates counts among those affected employees entitled to notice one employee who was laid off on April 30, 1991; one who was laid off on May 10, 1991; and three who were laid off on October 7, 1991. These 5 employees did not suffer an employment loss within the 30 day period of January 22, 1991 and were not entitled to notice. Therefore, according to the corrected schedule of hire dates, 46 (58–7–5) employees suffered an employment loss upon the closing of Bishop Tube on January 22, 1991.

The USWA has failed to show that at least 50 employees were affected by the closing of Bishop Tube and therefore, it has failed to show that the closing was covered by the provisions of the WARN Act. However, as discussed below, even if the Debtor had been subject to the provisions of the WARN Act, the Debtor, and consequently the bankruptcy estate, have no liability.

### C. "Faltering Company" Exception

■ The "faltering company" exception to the WARN Act permits an employer to reduce the 60 day notification period. 29 U.S.C. § 2102(b)(1); 20 CFR § 639.9. If the exception is applicable, the employer must give as much notice as is practicable and at the time notice is given, provide a brief statement of the basis for reducing the notice period. 29 U.S.C. § 2102(b)(3); 20 CFR § 639.9. To qualify for reduced notice under the "faltering company" exception:

(1) An employer must have been actively seeking capital or business at the time that 60-day notice would have been required. That is, the employer must have been seeking financing or refinancing through the arrangement of loans, the issuance of stocks, bonds, or other methods of internally generated financing; or the employer must have been seeking additional money, credit, or business through any other commercially reasonable method. The employer must be able to identify specific actions taken to obtain capital or business.

(2) There must have been a realistic opportunity to obtain the financing or business sought.

(3) The financing or business sought must have been sufficient, if obtained, to have enabled the employer to avoid or postpone the shutdown. The employer must be able to objectively demonstrate that the amount of capital or the volume of new business sought would have enabled the employer

to keep the facility, operating unit, or site open for a reasonable period of time.

(4) The employer reasonably and in good faith must have believed that giving the required notice would have precluded the employer from obtaining the needed capital or business. The employer must be able to objectively demonstrate that it reasonably thought that a potential customer or source of financing would have been unwilling to provide the new business or capital if notice were given, that is, if the employees, customers, or the public were aware that the facility, operating unit, or site might have to close. This condition may be satisfied if the employer can show that the financing or business source would not choose to do business with a troubled company or with a company whose workforce would be looking for other jobs. The actions of an employer relying on the "faltering company" exception will be viewed in a company-wide context. Thus, a company with access to capital markets or with cash reserves may not avail itself of this exception by looking solely at the financial condition of the facility, operating unit, or site to be closed.

20 CFR § 639.9

Early in 1990, the Debtor began efforts to secure a new lending institution. Its present bank was making less cash available, taking offsets and increasing reserves. The Debtor began serious negotiations with potential investors. In June, 1990, one of the most favorable prospects indicated an unwillingness to go forward. The Debtor then broadened its base to seek financing or an investor. It had serious negotiations with Westinghouse Merchant Bank through October, 1990 when that bank announced that it could not proceed. The Debtor moved from seeking a cash infusion in the form of a loan or from a minority investor to a position where it was willing to relinquish a majority of the company. During November, 1990, the Debtor continued to negotiate with another lending institution, CIT, while at the same time contacting a law firm for professional help to compile an investment prospectus. It was the Debtor's intention to "perpetuate the companies." The investment prospectus was completed and numerous solicitations were mailed just prior to the Christmas, 1990 holidays. Following those solicitations in mid to late December, the Debtor had contacts with prospective investors. Some of them visited its facilities and the Debtor's representatives also travelled to meet with other interested parties.

Robert Keifer ("Keifer"), the Debtor's Chairman of the Board, testified that there was never any intent to sell Bishop Tube and never any thought of closing the facility prior to January 21, 1991.

Reck testified that there was never any talk or discussion of closing Bishop Tube prior to January 22, 1991 and that the USWA employees had regularly worked overtime right up until the day of closing. William Burke ("Burke"), the Debtor's Vice-President of Administration, testified that he did not learn of the closing until he was called into Keifer's office late on January 21, 1991. Bishop Tube never ceased acceptance of orders from customers prior to the closing date.

It is clear that the closing was not anticipated or planned in advance. Keifer made the decision to close on January 21, 1991 when the Debtor was unable to procure an investor in time and simply ran out of cash and was unable to continue.

The USWA asserts that the Debtor was required to give a 60 day notice in November, 1990 that Bishop Tube would close in January, 1991. In November, 1990 and right up until the closing on January 22, 1991, the Debtor was actively seeking capital to avoid the shutdown and to "perpetuate" the company.

Running out of money and the inability to obtain further advances from the bank was the final event which forced the closing of Bishop Tube. There is no way the Debtor's officers could have or should have foreseen the precise date of a fatal cash flow deficiency sixty days in advance. As long as Debtor's management had a reasonable prospect of securing either additional loan money or a capital investment, it is unreasonable to expect a 60 day notice of plant closing to have

been given, since that would have foreclosed the possibility of staying open.

When the cash ran out, the options available to the Debtor's managers were non-existent. If the plant were kept open, the workers would have no available source of cash for their payroll. Also, material purchases could only be made on credit. In either event, the Debtor's managers could be severely rebuked and possibly punished for incurring debt for wages and materials after they became aware that the Debtor could not pay the bill.

This is not a case where the Debtor-company shut down one facility on short notice in order to move the plant to a new location. This is a Chapter 7 bankruptcy case where the owners lost their entire investment and general unsecured creditors will receive only a partial dividend.

■ Even when the "faltering company" exception applies, the Debtor is still required to give "as much notice as is practicable." 29 U.S.C. § 2102(b)(3). In this case, notice was not given until the day of closing. However, the decision to close, caused by the exhaustion of available cash, was made only late the night before closing. The notice was short, but there was no opportunity for greater notice. The notice also provided the reason for the necessity to close, the company has been unsuccessful in turning around its negative cash flow position.

We find that the "faltering company" exception applies. Further, the penalty for violation of the WARN Act is that the equivalent of 60 days' wages must be paid to wage earners. That is no doubt a penalty imposed upon the employer to be avoided only by giving the requisite notice. In this case, the penalty does not fall upon the owner because the owner is in Chapter 7. The impact here and the penalty falls upon other creditors, so that it is doubtful that the purpose of the WARN Act would be fulfilled by allowing the USWA's claims for WARN Act penalties.

### D. Good Faith

29 U.S.C. § 2104(a)(4) provides:

(4) If an employer which has violated this chapter proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter the court may, in its discretion, reduce the amount of the liability or penalty provided for in this section.

11 U.S.C. § 2104(a)(4).

■ In this case, there were never any "secret plans" to close Bishop Tube. Prior to the night before the shutdown, the closing was not contemplated. When the cash ran out, the Debtor's management had no other options.

The Debtor was aware of the WARN Act and was cautious to not violate its requirements. On January 21, 1991, before Bishop Tube ceased operations, Keifer gave instructions to Burke to contact legal counsel to assure compliance with the WARN Act's requirements. Burke spoke with legal counsel prior to the closing and was convinced that Bishop Tube could immediately close without violation of the WARN Act.

We find that the closing was done in good faith and that the Debtor reasonably believed that the closing was not a violation of the WARN Act. Accordingly, even if the Debtor had violated the WARN Act, the mitigating circumstances would negate any penalty.

### E. Conclusion

The Trustee's objection to the USWA's claim numbers 598 and 764, which assert claims for violation of the WARN Act, will be sustained and the claims will be disallowed.

### II. Vacation Pay Claims

The Trustee and the Union disagree on the timing at which the employees earned vacation pay and the amount of vacation pay which each employee was entitled to as of January 29, 1991, the date the Debtor filed its bankruptcy Petition. The Collective Bargaining Agreement covering the union employees at Bishop Tube provides in pertinent part:

ARTICLE XVI
VACATIONS
Section 1. Each employee who is on the active payroll of the Company and who has had continuous service with the Company on the anniversary date of his employment as set forth below, shall be eligible for a vacation as follows:

| Continuous Service | Vacation Allowance |
| --- | --- |
| One to three years | One week |
| Three to ten years | Two weeks |
| Ten or more years | Three weeks |

Section 2. No employee shall be eligible for the above vacation allowance unless he shall have worked eighteen hundred (1800) hours during the preceding calendar year. For purposes of this section only, time paid for shall be deemed time worked. If an employee's attendance at work is less than eighteen hundred (1800) hours worked during such period, his vacation allowance shall be reduced on a pro rata basis using 2080 hours as the denominator and the hours worked as the numerator.

The USWA points to Section 2 and asserts that if an employee worked 1800 hours in 1990, the employee became entitled to his entire 1991 vacation pay on January 1, 1991, irrespective of the employee's anniversary date. The USWA fails to refer, however, to Section 1, which clearly provides that an employee is eligible for a vacation only upon the anniversary date of his employment. Thus, the employees earned vacation time, and their claims for vacation pay, based upon their respective anniversary dates.

It is not disputed that the Debtor paid each employee for vacation earned on their anniversary date in 1990. Thus, the employees are entitled to a claim for vacation pay calculated on a pro rata basis from the employees' anniversary date in 1990 until the date of the bankruptcy, January 29, 1991. The Trustee has correctly analyzed the amount of vacation pay claims in this manner as set forth in the exhibits attached to Motion 91–1908.

Under 11 U.S.C. § 507(a)(3), vacation pay claims are third priority unsecured claims to the extent that the vacation pay is earned within 90 days prior to the date of the bankruptcy Petition, but limited, when combined with other third priority claims for wages, to $2,000 per individual. The balance of the claims for vacation pay represent gen-

eral unsecured claims which are paid pro rata with all of the other general unsecured claims. *In re Roth American, Inc.,* 120 B.R. 356 (Bankr. M.D. Pa.1990), *aff'd* 975 F.2d 949 (3d Cir.1992); *In re Northwest Engineering Co.,* 863 F.2d 1313 (7th Cir.1988).

The Trustee's objection to the USWA's Claim Number 394 will be sustained and the claims for vacation pay will be allowed in the amounts and priority as shown on the Trustee's Exhibits to Motion No. 91–1908.