**In re PRE–PRESS GRAPHICS COMPANY, INC., Debtor.**

**No. 02 B 08292.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Jan. 16, 2003.

David K. Welch, Dannen, Crane, Heyman & Simon, Chicago, IL, Attorney for Debtor.

Daniel M. Pelliccioni, David R. Shevitz, Justin M. Hines, Katten Muchin Zavis Rosenman, Chicago, IL, for Movant.

Jonathan W. Young, James E. Morgan, Wildman Harrold, Allen & Dixon, David J. Letvin, Letvin & Stein, Chicago, IL, for Respondents.

Bruce Waldo, Tishler & Waldo, Kenneth E. Rechtoris, John S. Delnero, Bell, Boyd & Lloyd, Chicago, IL, Michael Traison, Miller, Canfield, Paddock & Stone, Detroit, MI, for the Official Unsecured Creditors Committee.

## MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the motion of David A. Nolte ("Nolte") for payment of post-petition compensation obligations associated with his Employment Agreement (the "Employment Agreement") and Stock Option Agreement (the "Stock Option Agreement") with Pre-Press Graphics Company, Inc. (the "Debtor") and the objections thereto filed by the Debtor, MAN Capital Corporation ("MAN"), Northshore Community Bank & Trust Company (the "Bank") and the Unsecured Creditors' Committee (the "Committee") (collectively the "Objectors"). Nolte contends that pursuant to the provisions of the Stock Option Agreement, he has appropriately elected to receive cash in the sum of $589,286.50, which he asserts is entitled to payment as a post-petition priority expense of administration under 11 U.S.C. § 503(b)(1)(A) and § 507(a)(1). The Objectors maintain that because the Debtor properly rejected the Employment Agreement and the Stock Option Agreement pursuant to 11 U.S.C. § 365, Nolte's claim is thereby relegated to a pre-petition unsecured claim under § 365(g)(1). For the reasons set forth herein, the Court holds that Nolte's claim is partially allowed as a post-petition priority expense of administration in the sum of $59,333.33 under § 503(b)(1)(A) and § 507(a)(1). The objections thereto are sustained in part.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A)and (O).

## II. FACTS AND BACKGROUND

The Debtor is engaged in the graphic arts and printing business, and employed Nolte under the Employment Agreement as its vice president of sales. *See* Nolte's Exhibit No. 1, Recital ¶ A. Nolte and the

Debtor entered into the Employment Agreement on April 30, 2001. *Id.* The Employment Agreement provided that in order to induce Nolte to enter into it and to create an incentive and reward for his efforts, the Debtor granted Nolte an option to purchase shares of common stock of the company pursuant to the Stock Option Agreement. *Id.* Recital ¶ B. The Stock Option Agreement was finalized, dated October 8, 2001 and incorporated into the Employment Agreement. *Id.* Under the Employment Agreement, Nolte was to receive certain annual base salary compensation, plus sales commissions, reimbursement of employee expenses, various vacation time, and other fringe benefits not in dispute. *Id.* Article III, §§ 3.1–3.5.

The heart of the dispute concerns the provisions of Section 3.7 of the Employment Agreement by which Nolte was granted a stock option to purchase up to an aggregate of 350 shares of common stock of the Debtor. Under the Stock Option Agreement, upon achieving the requisite level of sales for the Debtor, Nolte would earn the right to purchase those shares. The Stock Option Agreement alternatively provided that in lieu of purchasing shares, Nolte could opt to receive a cash payment provided that Nolte had made sales (as defined under the Stock Option Agreement) of the products or services of the company during the period commencing April 30, 2001 and ending on October 31, 2003. *See* Nolte's Exhibit No. 1, Exhibit A thereto at ¶ 3(b). "Sales" collectively included, (a) sales to new accounts that Nolte created for the Debtor; (b) sales created by sales personnel whom Nolte recruited for the Debtor; (c) sales to new accounts created by existing personnel of the Debtor; and (d) additional sales from existing customers of the Debtor, provided credit for such sales is first approved, in writing, by the president of the Debtor. *Id.* ¶ 3(b). Nolte's qualifying sales thus included those not only made by him, but also sales personnel identified as Dave Azarelis (who made no sales), Dave Bourke and Steve Kramer.

Nolte testified that he entered into the Employment Agreement and the Stock Option Agreement because he wanted to acquire some equity ownership in the company. He was admittedly desirous of influencing the direction of the Debtor. However, Robert Beevers, the president of the Debtor, would not agree to allow Nolte to acquire a controlling interest. This led to the creation of the optional provision allowing Nolte to convert his earned stock option to cash, as an incentive to enter into the Employment Agreement and to perform his duties as vice president of sales for the Debtor. According to Nolte, after the Employment Agreement was executed, he began managing the Debtor's sales force and increasing the sales staff and the amount of sales. He recruited two additional salesmen onto the sales force, which included the most productive salesman for the Debtor. Nolte testified that he kept sales accounts satisfied and that his efforts increased the Debtor's sales by 37%. According to Nolte, his prior employment base compensation was greater, and the Stock Option Agreement was the incentive he needed in order to enter into an employment relationship with the Debtor. Nolte's Exhibit No. 2 is a summary sales credit report by which Nolte received credit for qualifying sales from the time of his employment through August 2002. According to Nolte's testimony, he achieved his first benchmark level under the Stock Option Agreement in May 2002, when the qualifying sales exceeded $3,000,000.00. The Court notes from Nolte's Exhibit No. 2 that the post-petition amount of qualifying sales from the period of March

through August 2002 totals approximately $1.78 million.

On March 4, 2002, the Debtor filed a voluntary petition under Chapter 11. Nolte continued to work for the Debtor and even received a commendation for his efforts in the form of an e-mail, which was forwarded to all employees by Beevers on April 11, 2002. *See* Nolte's Exhibit No. 6. After Nolte achieved the first benchmark for the required sales under the Stock Option Agreement post-petition, he exercised his option to receive cash instead of shares of stock by letters dated June 4, 2002 and June 16, 2002. *See* Nolte's Exhibit Nos. 4 and 5. After the letters were sent, Nolte continued to work for the Debtor and assist in its sales efforts.

After the bankruptcy filing, Nolte approached Beevers who assured him that his employment would continue and the Agreements would be "going forward as usual." Accordingly, Nolte continued to perform his duties. However, had he not received those assurances, Nolte asserted that he would have begun to look elsewhere for work.

Examples of some of the Debtor's monthly sales activity reveal that sales obtained by Nolte directly from his own efforts varied. For the June 2002 qualifying sales of over $215,000.00, Nolte directly accounted for $3,542.00. *See* Nolte's Exhibit No. 8. For the sales period of October 2001, Nolte accounted for 13% of the sales. *See* Nolte's Exhibit No. 9, at p. 2.

Nolte resigned in August 2002, after the Debtor filed a motion to reject the Employment Agreement and the Stock Option Agreement under § 365(a)(1). According to Nolte, the Debtor benefitted from his efforts because he continued to perform for the Debtor post-petition. He brought in salesmen and through his efforts and those of his sales force, obtained an additional $1.8 million in sales. On cross-examination, Nolte admitted that he was not sure of the exact dollar amount generated by his own personal efforts. He also testified that his sales commissions were generally at the rate of 10%—a fairly common rate in the printing and graphic arts industry. He admitted that the subject option provisions were not a benchmark within the industry.

The only other witness who testified was Beevers, president of the Debtor. Beevers testified that because of the Debtor's distressed financial condition—which led to its bankruptcy filing—he attempted to negotiate a new Employment Agreement with Nolte post-petition. He denied telling Nolte that the Debtor would be able to pay the alternate cash out option under the Stock Option Agreement simply because the Debtor did not have the financial resources to pay out cash in lieu of stock. According to Beevers, he merely assured Nolte that he would honor the Employment Agreement terms. On cross-examination, Beevers indicated that the Debtor did not immediately move to reject the Employment Agreement and Stock Option Agreement because he tried to negotiate a new Employment Agreement with Nolte. Beevers was aware of Nolte's work for the Debtor and accepted his efforts, which he admitted added value to the Debtor. After receipt of Nolte's exercise of his option for cash under the Stock Option Agreement, the parties were unable to renegotiate the Agreements. In July 2002, the Debtor moved to reject the Agreements.

The parties do not dispute that Nolte has a claim against the Debtor for rejection damages under § 365(g)(1) or that Nolte may assert as a pre-petition claim for breach of the contract by virtue of its rejection. As a corollary, the allowance of any such claim is subject to § 502(b)(7), which limits a claim for breach of an em-

ployment contract to the compensation provided by the contract for one year after the breach.

The thrust of Nolte's argument in the instant motion is that because the Debtor's qualifying sales under the Stock Option Agreement reached the first and subsequent benchmarks post-petition, his entire claim is entitled to administrative treatment under § 503(b)(1)(A) and § 507(a)(1). In contrast, the Objectors argue that the underlying contractual liability to make the cash payment arose pre-petition on April 30, 2001, the date of the inception of the Employment Agreement. Therefore, the Objectors contend that Nolte's claim is not entitled to administrative priority, but rather an unsecured nonpriority claim pursuant to § 365(g)(1) inasmuch as the Court entered its order allowing the Debtor's motion to reject the Employment Agreement and the Stock Option Agreement.

## III. *DISCUSSION*

An expense of administration claim is governed by § 503(b) which provides in relevant part:

> (b) After notice and a hearing, there shall be allowed administrative expenses . . . including—
>
> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

11 U.S.C. § 503(b)(1)(A).

■ Administrative priority claims are to be strictly construed because the presumption in bankruptcy cases is that the debtor has limited resources which will be equally distributed among creditors. *See In re Amarex, Inc.*, 853 F.2d 1526, 1530 (10th Cir.1988).

■ Rejection of an underlying contract constitutes a breach of the contract, which

usually results in a three-prong claim against the estate: (1) a general unsecured claim for any accrued unpaid rent due under the lease or contract prior to the bankruptcy filing under 11 U.S.C. § 502(b)(6)(B), (7)(B); (2) an administrative (and therefore a priority) claim for rent amounting to either rent that accrued post-petition but prior to rejection or the reasonable value of services or goods for that same time whichever the court finds appropriate under § 503(b)(1)(A) and § 507(a)(1); and (3) a general unsecured claim for "rejection damages" (amounts due under the remaining term of the lease or contract) under § 502, subject to certain limitations on the maximum amount a claimant may claim as rejection damages under § 502(b)(6)(A) and § 502(b)(7)(A). *See* 1 T. Salerno, C. Hansen and G.C. Meyer, *Advanced Chapter 11 Bankruptcy Practice* § 7.74 (2d ed.1996 and 2002 Cum. Supp) (collecting cases).

■ The policy underlying priority treatment for administrative expenses is to encourage creditors to extend credit to debtors which will enable a reorganization to succeed. *See In re Jartran, Inc.*, 732 F.2d 584, 586 (7th Cir.1984). To that end, in order to demonstrate the priority of an administrative claim, the debt must (1) arise out of a transaction with the debtor-in-possession and (2) benefit the operation of the debtor's business. *Id.* at 586–87(*citing In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976)).

■ This two-part test employed in *Jartran* and *Mammoth Mart* is applied to executory contracts such as Employment Agreements even if the agreement has been rejected. *See, e.g., In re Hooker Invs., Inc.*, 145 B.R. 138 (Bankr.S.D.N.Y. 1992); *In re APF Co.*, 270 B.R. 567 (Bankr.D.Del.2001); *In re Commercial Fin. Servs., Inc.*, 246 F.3d 1291 (10th Cir.

2001) (the lump sum cash payments due on termination under employment contracts not assumed by the debtors held not entitled to administrative priority); *In re Carmichael,* 109 B.R. 849 (Bankr.N.D.Ill. 1990).

■ The first element of the *Jartran* test is the principal focus of the dispute. The Objectors contend that because the Agreements were entered into pre-petition, the debt did not arise out of a transaction with the Debtor. The Objectors, in applying this prong with the sole focus on the pre-petition date of the Agreements would, at first blush, appear to defeat Nolte's claim for administrative priority status. *Jartran,* however, also noted that this element can be met by a showing of "*inducement* of the creditor's performance by the debtor-in-possession...." 732 F.2d at 588 (emphasis in original).

By assuring Nolte that the Agreements would be "going forward" and continuing to accept Nolte's services and the benefits flowing therefrom, the Debtor induced Nolte's performance. The evidence adduced at trial is undisputed that the Debtor urged and used Nolte's continued services and efforts post-petition. This is illustrated most dramatically by Beevers' company wide e-mail, acknowledging Nolte's efforts and noting in part that he would "like everyone to know that [Nolte] has my complete and unconditional support." *See* Nolte's Exhibit No. 6. Nolte performed until employment negotiations failed, which led to the Debtor's rejection motion. Accordingly, the Court rejects the Objectors' argument that Nolte's administrative claim must fail because it arises from the pre-petition Agreements.

■ As to the second element of the *Jartran* test, it is only in dispute as to the amount claimed. There is no question that Nolte's services benefitted the Debtor's business. What the Objectors contend is that Nolte's claim is largely disproportionate to the benefit received by the Debtor.

Had Nolte exercised his option to receive stock in the Debtor, his claim would be subject to mandatory subordination under 11 U.S.C. § 510(b). Section 510(b) in pertinent part provides that "[f]or the purpose of distribution under this title, a claim arising from ... sale of a security of the debtor ... shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock." 11 U.S.C. § 510(b). Because Nolte opted for cash rather than stock, the Court views his claim as one for additional incentive compensation under the Agreements.

A further restriction on administrative wage claims in all types of cases is a necessary finding that the amount claimed as compensation for the services is reasonable. Section 503(b)(1)(A) does not impose a statutory maximum on administrative wage claims. The courts have, thus, policed against excessive wage claims by demanding that the claim not be disproportionate to the value of the services rendered. *See* 2 W. Norton Jr., *Norton Bankruptcy Law and Practice 2d,* § 42:18 at p. 42–101 (2d ed.1994). *See also In re Chicago Lutheran Hosp. Ass'n,* 75 B.R. 854, 857 (Bankr.N.D.Ill.1987) (post-petition wage related claims are entitled to be treated as first priority administration claims under § 503(b)(1)(A) and § 507(a)(1)).

In part, the thorny problem here is exacerbated by the confusing labyrinth of the text of § 365 which one noted authority refers to as "perhaps the most discussed and cussed provision of the Bankruptcy Code.... Just as in the writings of George Orwell, where some pigs were more equal

than others, in the writings of Congress some leases and contracts are more equal than others." 1 D. Epstein, S. Nickles and J. White, *Bankruptcy* § 5–26 at p. 492–493 (1992) (noting different rules under § 365 for different types of contracts and leases). This authority concludes the existence of an administrative expense priority should turn on whether the estate has realized a benefit, not on whether a particular creditor has sustained a loss. *Id.* at § 5–23, p. 489. Another leading authority has noted, illustrative of the dispute and polarity of the positions of the parties at bar, that "[t]he Code is silent on the rights and obligations of the parties to an executory contract or unexpired lease during the limbo period-that is, the period between the filing of the petition and the time of assumption or rejection." G. Treister, J.R. Trost, L. Forman, K. Klee and R. Levin, *Fundamentals of Bankruptcy Law* § 5.04(e) at p. 287 (4th ed.1993 and 1998 Supp.). This authority also aptly notes:

A claim for damages that arises from the rejection of a contract or lease ... must be distinguished from the ... obligation of the estate to pay for the post-petition use ... but the measure of the administrative expense is not entirely clear. Some courts have required the estate to pay fair market value for the use; others, seeing the issue as one of preventing unjust enrichment, base the allowance on the value of the use to the estate, which may be less than an objective fair valuation.

*Id.* § 5.04(f) at p. 293.

Research does not disclose a situation on all fours factually with the case at bar. The Stock Option Agreement by which Nolte was granted an option to acquire equity in the Debtor, with the alternative of a cash payment in lieu of stock if he met certain sales requirements, presents interesting and unusual provisions. Stock op-

tion claims have generally been held not to be entitled to administrative priority. *See In re Baldwin–United Corp.,* 52 B.R. 549 (Bankr.S.D.Ohio 1985). Unlike the facts of this matter, in *Baldwin,* the court found that neither the purposes of the option plan nor the manner of its exercise suggested that it was to serve as a form of compensation for continuing services rendered. *Id.* at 552. That court also noted, as the Objectors unpersuasively argue here, that the debtor did not, in fact, induce such performance. *Id.* Consequently, the first prong of the *Jartran* test was not met.

In the instant matter, the Court concludes that both elements of the *Jartran* test have been met by Nolte, especially in light of dicta from the United States Supreme Court. The Supreme Court stated that if the debtor elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor is obligated to pay for the reasonable value of those services, which, depending on the circumstances of the particular contract, may be what is specified in the contract. *See National Labor Relations Board v. Bildisco and Bildisco,* 465 U.S. 513, 531, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (citations omitted). On this point, the Objectors opine that Nolte has been paid substantially all compensation due to him for base salary, sales commissions, sale expenses and fringe benefits. Further, those payments were made post-petition and constitute reasonable value for Nolte's services during the pendency of rejection of the Employment Agreement. Nolte, to the contrary, concludes that the terms of the Agreements provide the best evidence of the reasonable value of Nolte's services; the incentive compensation he opted for under the Agreements, in lieu of stock in the Debtor, was intended to supplement his base salary and provide an alternate

means for acquiring an equity portion of the common stock of the Debtor at this option. Nolte testified that he agreed to a lower base salary for such supplemental compensation. Hence, the ultimate question turns on whether the amount of Nolte's administrative claim as calculated under the Agreements is equal to the reasonable value for his services rendered post-petition for the Debtor.

Other courts have noted that in analyzing employee benefits under the *Jartran* test, the determinative factor is not when the right to payment matured but, rather, when payment was earned. *In re Uly–Pak, Inc.,* 128 B.R. 763, 766 (Bankr.S.D.Ill. 1991); *In re Chicago Lutheran Hosp.,* 75 B.R. at 856; *In re Northwest Eng'g Co.,* 863 F.2d 1313 (7th Cir.1988) (vacation pay held "earned" continuously as work is done for § 507(a)(3) priority purposes). The *Uly–Pak* court held the right to severance pay vested when an employee signed the pre-petition employment contract, not when the employee was terminated post-petition. Thus, the claim was only entitled to general unsecured status.

Other authorities aptly note that an employee is entitled to be paid for any time actually expended for the benefit of the estate between the filing of the petition and the rejection of the employment contract. "Such services should be compensated on a quantum meruit basis rather than under the contract, although the contract rate, if it in fact represents fair market value, can apply." *See* 1 R. Ginsberg and R. Martin, *Ginsberg & Martin on Bankruptcy* § 7.04[C] at 7–44 (1998 Supp.) (citing *In re Vermont Real Estate Inv. Trust,* 25 B.R. 809 (Bankr.D.Vt.1982)and *In re Selva & Sons, Inc.,* 21 B.R. 929 (Bankr.E.D.N.Y.1982)). The *Vermont Real Estate* and *Selva* cases applied the concept of reasonable value for use and occupancy of premises involving situations where there was no evidence to indicate that the reasonable rental value for use and occupancy of the demised premises post-petition was anything other than that fixed in the underlying lease. Those courts followed the general rule for determining reasonable value of use and occupancy of the premises to be rent reserved in the absence of a clear showing that it is unreasonable. The concept of reasonable use and occupancy arises out of the pre-Code practice under Chapter XI reorganizations under the former Bankruptcy Act of 1898 relating only to the limbo period during which the underlying lease was neither assumed or rejected. *See Philadelphia Co. v. Dipple,* 312 U.S. 168, 61 S.Ct. 538, 85 L.Ed. 651 (1941); *Palmer v. Palmer,* 104 F.2d 161 (2nd Cir.1939). Here, the evidence shows that the Agreements were rejected because they were excessively expensive to the Debtor's estate and above industry benchmarks. Further, the evidence indicates that the industry standard for sales commissions is approximately 10%.

It is undisputed that for approximately four months post-petition, Nolte brought in new customers, continued to make sales, managed the sales force and recruited the Debtor's salesmen, clearly benefitting the Debtor. While Nolte is certainly equitably entitled to some post-petition administrative claim under the incentive compensation arrangement in the Agreements, the amount should be based on the quantum meruit value for his services. The estate should not be required to pay Nolte for the services provided by the other salesmens and the results achieved by them during the post-petition period. After all, the post-petition sales attained were the result of the combination of Nolte's efforts and those of the salesmen brought on board by Nolte. Although Nolte claims credit for the sales made by his recruits under the Stock Option Agreement on a quantum

meruit basis, Nolte cannot maintain an administrative claim for those substantial sales actually consummated by other salesmen for the Debtor.

The Court will mete out the portion of Nolte's post-petition claim from those of the other sales personnel and award him for his post-petition services. Nolte's Exhibit No. 8 shows that Nolte's share was only $3,542.00 of the $215,739.06 total qualifying sales for the month of June 2002, in contrast to Bourke, whose share was $17,083.46, and Kramer, whose share was $195,113.60. Illustrated in Nolte's Exhibit No. 9, for the sale period of October 2001, Nolte was credited with sales of $44,940.31 for his efforts, in contrast to the other sales personnel who generated sales of $288,938.20. In that month, Nolte generated only 13% of the sales. The exact amount of total post-petition qualifying sales generated by Nolte himself is unknown, with the total amount of post-petition qualifying sales by Bourke, Kramer and Nolte totaling approximately $1.78 million. *See* Nolte's Exhibit No. 2. Nolte's per capita portion or share of that pool is one-third or $593,333.34.

This per capita approach is equitable and generous inasmuch as the evidence was undisputed that Bourke generated the highest sales for the Debtor and because there were only three salesmen, including Nolte, who made qualifying sales. Ascribing a per capita share to Nolte, in the absence of more precise information, gives him the benefit of his executive management efforts. Moreover, the evidence was undisputed that Nolte increased the Debtor's sales by 37%. According to the testimony, the industry standard for sales commissions is approximately 10% and that is what the Court will use as a more appropriate measure of value, rather than award Nolte at a substantially higher rate as he urges. Accordingly, on a quantum meruit

basis, $59,333.33 is the equitable allowance the Court will award Nolte as a post-petition priority expense under § 503(b)(1)(A) and § 507(a)(1).

■ The equitable result here is in accord with the underlying principle in *Northwest Eng'g*, 863 F.2d 1313. Therein, the court held that vacation pay would be afforded administrative priority because it was earned continuously as the work was performed. While *Northwest Eng'g* is not exactly on point, the Court is persuaded that the logic and dicta therein provides an appropriate basis to achieve the equitable result reached here because "[c]ourts routinely conclude ... that vacation pay and bonuses may be paid out as administrative expenses only to the extent they reflect work done after the commencement of the case." *Id.* at 1316 (citations omitted). The court in *Northwest Eng'g* concluded that it was "congruent with the resolution of related problems, and consistent with the function of § 507(a), to hold that (prepetition) vacation pay is 'earned' continuously." *Id.* The same logic applies to postpetition administrative expense claims under § 503(b) and § 507(a)(1). The *Northwest Eng'g* court aptly noted that "[i]n the end, we must choose among unsatisfactory options." *Id.* at 1318.

Similarly, in this matter, the Court's options are not wholly satisfactory. To allow the full amount of Nolte's claim would not only compensate him for his work at a higher commission rate (100%) than admittedly exists in the industry, but would also allow him to bootstrap his claim from the services of others who generated a more substantial benefit to the Debtor's estate— namely salesmen Bourke and Kramer, as the Objectors argue. Thus, their objections on this point are sustained. To sustain in full the objections, however, would be to relegate Nolte's entire claim to that of a pre-petition unsecured claim, and de-

prive him of any portion of the agreed additional compensation for his work rendered post-petition that was induced by and benefitted the Debtor. The Court, therefore concludes that Nolte is not entitled to receive the full amount of additional compensation under the contractual provisions of the Agreements. Rather, Nolte is entitled to an administrative claim only to the extent of the reasonable value of his own services rendered to the Debtor, not those of Bourke and Kramer.

### IV. *CONCLUSION*

For the foregoing reasons, Nolte's motion is granted in part, and the objections thereto are sustained in part. Nolte's claim is partially allowed as a postpetition priority expense of administration under § 503(b)(1)(A) and § 507(a)(1) in the sum of $59,333.33.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.