**In re PRE–PRESS GRAPHICS COMPANY, INC., Debtor.**

**No. 02 B 08292.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Nov. 10, 2003.

Robert S. Reda, Esq., Brian A. McNeil, Esq., Reda & Des Jardins, Ltd., Chicago, IL, for Movant.

David K. Welch, Esq., Crane, Heyman, Simon, Welch & Clar, Chicago, IL, for Debtor.

### *MEMORANDUM OPINION*

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the motion of David A. Nolte ("Nolte") for

payment of post-petition compensation obligations associated with his Employment Agreement (the "Employment Agreement") with Pre Press Graphics Company, Inc. (the "Debtor").[1] Nolte claims that pursuant to the provisions of the Employment Agreement, he is entitled to the payment of $21,037.11, which he asserts is a post-petition priority expense of administration under 11 U.S.C. § 503(b)(1)(A) and § 507(a)(1). For the reasons set forth herein, the Court holds that Nolte's claim is partially allowed as a post-petition priority expense of administration in the sum of $13,199.07 under § 503(b)(1)(A) and § 507(a)(1). The objections thereto are sustained in part.

## I. JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O).

## II. FACTS AND BACKGROUND

The Debtor is engaged in the graphic arts and printing business, and employed Nolte under the Employment Agreement as its vice president of sales. *See* Nolte's Exhibit 1, Recital ¶ A. Nolte and the Debtor entered into the Employment Agreement on April 30, 2001. *Id.* Under the Employment Agreement, Nolte was to receive certain annual base salary compensation, plus sales commissions, reimbursement of employee expenses, various vacation time, and other fringe benefits. *Id.* Article III, §§ 3.1–3.5. On March 4, 2002, the Debtor filed a voluntary petition under Chapter 11. In August, 2002 the Debtor filed a motion to reject the Employment Agreement under § 365(a)(1). On August 15, 2002, this Court entered an order authorizing rejection of the Employment Agreement (the "Rejection Order"). Debtor's Exhibit B.

On January 16, 2003, this Court ruled on Nolte's claim for payment of post-petition compensation obligations associated with his Employment Agreement and Stock Option Agreement with the Debtor. *Pre–Press Graphics, Inc.*, 287 B.R. 726 (Bankr.N.D.Ill.2003). The Court granted the motion in part, and held that (1) the Employment Agreement and Stock Option Agreement arose out of a post-petition transaction between the Debtor and Nolte; and (2) Nolte's claim was limited to the amount that could be based on the quantum meruit value for Nolte's services. *Id.*

On May 23, 2003, Nolte filed the instant matter, a second administrative claim under § 503(b)(1)(A). The dispute focuses on the actual date of Nolte's employment termination. Nolte claims he is entitled to an administrative claim totaling $21,037.11 based on salary, commissions and expenses for services he performed for the benefit of the Debtor between August 15, 2002 and August 28, 2002. The Debtor claims that (1) Nolte's second claim is barred by *res judicata* and (2) even if the Court finds Nolte is entitled to compensation, his claim is limited to $1,055.24. The Debtor bases this number on the alleged termination

---

1. This is a second administrative claim filed by Nolte in the case. In *In re Pre–Press Graphics Co., Inc.*, 287 B.R. 726 (Bankr. N.D.Ill.2003) (*"Pre–Press I"*), this Court held that Nolte was entitled to an administrative claim only to the extent of the reasonable value of his own services rendered to the Debtor, under a provision in his Employment Agreement by which he was granted incentive compensation in the form of an option to purchase shares of company stock in the Debtor in lieu of a cash payment based on qualifying sales obtained through Nolte's efforts.

date of August 15, 2002 and argues that it accounts for all unpaid commissions and unpaid salary minus the sum of a $500.00 overpayment of Nolte's August 2002 auto allowance, an overpayment of $2,019.22 of unearned vacation time and a $100.00 payment for an invoice due from a company owned by Nolte. The Debtor has indicated that it is willing to pay Nolte $1,055.24.

Pursuant to the Court's Pre–Hearing Order, Nolte's Exhibits 11, 12, 14, 16 through 20, and 22 through 32 were not admitted into evidence.[2] The excluded exhibits were not provided to the Court or the Debtor on or before the date set by the Pre–Hearing Order. Accordingly, the Court barred those exhibits from admission into evidence. *See In the Matter of Maurice*, 21 F.3d 767 (7th Cir.1994). All of the Debtor's exhibits were timely filed and thus admitted into evidence.

Nolte claims he is owed $3,749.98 in unpaid salary. At trial, Nolte testified that under his Employment Agreement, he was entitled to an annual base salary of $75,000.00 for his duties as manager and vice president of the Debtor, which equates to $288.46 per day. Nolte also testified that he received his last paycheck for the pay-period ending August 12, 2002, and that he had not received any additional compensation for work performed after that date. Nolte's claim is based on the per diem salary of $288.46 for thirteen working days, between August 11, 2002 and August 28, 2002, for which he has not yet been compensated and that the Debtor refuses to pay. Nolte testified that his termination date was August 28, 2002, the day he resigned.

Nolte further testified that he was physically working in his office at the Debtor's location until August 28, 2002. He identified a printout of the Debtor's timekeeping record that established that he had entered and exited the Debtor's office on several occasions after August 15, 2002. Nolte's Exhibit 8. The timekeeping record reflects that Nolte was in the office between August 19 and August 23, 2002 for various durations. *Id.* He also indicated that he received a handwritten note about his earned but unpaid commissions from Mike Egan, the Debtor's production manager, while at his office on August 27 or 28, 2002.

Kinzie Thomas ("Thomas"), the Debtor's human resources manager and corporate secretary, testified on behalf of the Debtor. Thomas indicated that she is the individual responsible for collecting timekeeping reports, processing the salesmen's payroll, preparing termination memoranda and calculating any salary, commissions, expenses and vacation time that would be due to Nolte with respect to his termination. Thomas testified that the Debtor's termination memorandum on Nolte was prepared based on a termination date of August 15, 2002.

According to Thomas, Nolte's per diem salary was $288.46, and as indicated in the termination memorandum, Nolte was owed unpaid salary for three working days between August 11, 2002 and August 14, 2002, totaling $865.38. Debtor's Exhibit C. Thomas indicated that this represented the salary due to Nolte for the time between the end of the last pay-period for which Nolte received compensation and the August 15, 2002 termination date. *Id.*

On cross-examination, Thomas verified the genuineness of the timekeeping record that Nolte identified. Nolte's Exhibit 8. She also stated that after termination, employees are typically locked out of the company's computer system. Nolte's Ex-

---

2. Although Nolte's Exhibit 21 was not provided to the Court or to the Debtor per the Pre-Hearing Order, the parties stipulated to allow it into evidence and the Court agreed.

hibit 7 indicates that Thomas sent Nolte an internal company email (the "email message") which was dated August 27, 2002. Nolte's Exhibit 7. The substance of the email message indicates that Thomas requested an executed at-will employment agreement from Nolte by August 28, 2002. *Id.*

With respect to Nolte's vacation time, Thomas testified that all employees earn vacation time throughout the year and at the point of termination, the vacation days are prorated based upon how many days were worked during the year until the termination date. Thomas indicated that in the event the vacation days were earned but unused, the employee was paid for that time upon termination. In the event the days were used but unearned, the terminated employee would be required to reimburse the Debtor for those days. The email message from Thomas to Nolte indicates that according to the Debtor's records, Nolte accrued nine days of vacation from January 1, 2002 through August 14, 2002 plus three days carried over from the previous year, for a total of 12 vacation days. The email message and the calendar reflect that Nolte used 19 vacation days. Nolte's Exhibits 2 and 7. According to the email message and Thomas' testimony, Nolte was due 3 days of pay for the period of August 11 through August 14, but would still owe the Debtor for four days of vacation used but not yet accrued. *Id.* This would resolve the seven day discrepancy between the 12 vacation days accrued, and the 19 days actually used by Nolte prior to his termination.

Thomas also testified that she compiled work attendance records for Nolte and delivered them to his office at the Debtor's location on or about August 27, 2002. Thomas indicated that on August 27, 2002, she placed Nolte's timesheet on his desk in his office. Nolte testified that the internal

email sent to him by Thomas, the note left for him in his office by Egan and the timesheet Thomas placed in Nolte's office on August 27, 2002 would occur only with an active employee, not one who had been terminated. On cross-examination, Thomas indicated that it is not the Debtor's policy to allow terminated salesmen access to the Debtor's computer system.

The Debtor's president, Robert Beevers ("Beevers"), also testified on it's behalf. Beevers testified that regardless of further employment discussions which may have taken place between himself and Nolte, he considered that Nolte's employment was terminated on August 15, 2002, the date the Court entered the Rejection Order. Beevers testified that upon entry of the Rejection Order, Nolte entered his office and declared that the Debtor had apparently fired him. Beevers indicated that he informed Nolte that his employment was terminated effective with the entry of Rejection Order, but that the parties could discuss whether there were mutually acceptable terms to continue with his employment. He testified that between August 15 and August 28, 2002, Nolte was in the Debtor's building. On cross-examination Beevers also testified that a terminated employee would not be allowed access to the Debtor's computer system.

As to the auto allowance, the parties agree that Nolte was entitled to $1,000.00 per month. He received $1,000.00 for his pre-paid auto allowance in August 2002. The Debtor contends that since he was terminated on August 15, 2002, Nolte owes the Debtor half of the August monthly allowance or $500.00. On a 365 day calendar year, this amounts to $32.87 per day including weekends or $46.15 per day excluding weekends. Nolte claims that any amount claimed by the Debtor with respect to the auto allowance is limited to the three days between August 28, 2002

and August 31, 2002, two of which were working days for a total of $92.30, not the $500.00 claimed by the Debtor.

Nolte claims $16,492.84 in commissions for specific jobs that he performed as an employee of the Debtor for the benefit of the Debtor post-petition. The Debtor acknowledges that in August 2002, Nolte earned $155,783.83 and was paid out $152,916.51, a difference of $2,867.32. The invoices for the jobs were not admitted into evidence per the Court's Pre–Hearing Order. However, the Court permitted testimonial evidence with respect to these jobs. The parties dispute the precise amount of commissions due to Nolte based on certain jobs performed and the amounts actually received by the Debtor for the work performed by Nolte.

Particularly, Nolte claims he is owed commissions on specific jobs he performed for FCB Marketing Drive ("Marketing Drive"), a customer of the Debtor during Nolte's tenure. Jennifer Kallman ("Kallman"), an employee of Marketing Drive, testified on behalf of Nolte. Kallman testified that Nolte was Marketing Drive's contact person and sales representative for the Debtor. Her company was satisfied with his work efforts, and the Debtor's sales to her firm are the basis for the largest component of Nolte's claim against the Debtor for sales commissions.

## III. *DISCUSSION*

 The Debtor argues that Nolte is barred from asserting a second administrative claim on *res judicata* grounds. *Res Judicata* bars a subsequent claim if it is based on the same, or nearly the same factual allegations. *Herrmann v. Cencom Cable Assocs. Inc.*, 999 F.2d 223, 226 (7th Cir.1993); *Colonial Penn Life Ins. Co. v. Hallmark Ins. Adm'rs, Inc.*, 31 F.3d 445, 447 (7th Cir.1994). In analyzing claims on *res judicata* grounds, the Seventh Circuit

applies the "same transaction" test. *In re National Industrial Chemical Co.*, 237 B.R. 437, 441 (Bankr.N.D.Ill.1999), *citing Car Carriers, Inc. v. Ford Motor Co.*, 789 F.2d 589, 593 (7th Cir.1986). Under the "same transaction" test, a claim has identity with a previous claim where both claims arise from a single core of operative facts. *Id., citing Brzostowski v. Laidlaw Waste Systems, Inc.*, 49 F.3d 337, 339 (7th Cir. 1995). The Debtor argues that Nolte's claim arises out of the Employment Agreement and therefore substantially arises out of the same facts. However, the Court finds to the contrary: Nolte's claim does not arise from the same set of facts. In the proceedings dealing with the last claim, the parties reserved their claims and objections dealing with the issues raised here regarding Nolte's claims for unpaid salary, commissions and vacation benefits. Nolte's second administrative claim is mainly based on wages and commissions due to him after the Debtor rejected the Employment Agreement. Nolte's claim against the same party does not in this matter arise out of the same set of facts or focus on the same provision in the Employment Agreement as the first claim. The facts in dispute in the instant matter arose after August 15, 2002 when the Debtor rejected the Employment Agreement. At the time Nolte's first administrative expense claim arose, the facts which have led to the instant matter had not yet arisen. Therefore, the Court finds *res judicata* does not bar Nolte's present claim.

In *Pre–Press I*, this Court held that Nolte's claim was partially allowed as a post-petition administrative expense of administration. *Pre–Press Graphics, Inc.*, 287 B.R. at 734–35. The Court stated that if it were to wholly sustain the objections, Nolte's claim would be relegated to that of a pre-petition unsecured claim, depriving

him of any portion of the agreed additional compensation for his work performed post-petition that was induced by and benefitted the Debtor. *Id.* The Court held that Nolte was entitled to the reasonable value of his own services rendered to the Debtor, which the Court based on the quantum meruit value of those services.

In the instant matter, the Court adopts and reiterates the findings of fact and conclusions of law in *Pre–Press I*, and now finds that Nolte's second claim is also entitled to administrative priority status. At issue is the precise amount due to Nolte for unpaid salary and commissions for work performed post-petition for the benefit of the Debtor. For this reason, the Court will briefly discuss the status of Nolte's claim as an administrative claim. An expense of administration claim is governed by § 503(b) which provides in relevant part:

(b) After notice and a hearing, there shall be allowed administrative expenses ... including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

11 U.S.C. § 503(b)(1)(A).

Administrative priority claims are to be strictly construed because the presumption in bankruptcy cases is that the debtor has limited resources which will be equally distributed among creditors. *See In re Amarex, Inc.,* 853 F.2d 1526, 1530 (10th Cir.1988).

As noted earlier, the Debtor rejected Nolte's Employment Agreement pursuant to this Court's Order. *Pre–Press Graphics, Inc.,* 287 B.R. 726. Rejection of an underlying contract constitutes a breach of the contract, which usually results in a three-prong claim against the estate: (1) a general unsecured claim for any accrued unpaid rent due under the lease or contract prior to the bankruptcy filing under 11 U.S.C. § 502(b)(6)(B), (7)(B); (2) an administrative (and therefore a priority) claim for rent amounting to either rent that accrued post-petition but prior to rejection or the reasonable value of services or goods for that same time whichever the court finds appropriate under § 503(b)(1)(A) and § 507(a)(1); and (3) a general unsecured claim for "rejection damages" (amounts due under the remaining term of the lease or contract) under § 502, subject to certain limitations on the maximum amount a claimant may claim as rejection damages under § 502(b)(6)(A) and § 502(b)(7)(A). *See* 1 T. Salerno, C. Hansen and G.C. Meyer, *Advanced Chapter 11 Bankruptcy Practice* § 7.74 (2d ed.1996 and 2002 Cum. Supp) (collecting cases). Contrary to the Debtor's objections and arguments, the rejection of the Employment Agreement for § 365 purposes did not terminate it *ipso facto.* Rather, rejection constitutes a breach giving rise to Nolte's damage claim arising therefrom. In short, the rejection had no effect upon the Agreement's contractual existence. *See* § 365(g); *South Motor Chrysler–Plymouth, Inc. v. Chrysler Motor Corp. (In re South Motor Co. of Dade County),* 161 B.R. 532, 545–46 (Bankr. S.D.Fla.1993), *citing* Michael T. Andrew, *Executory Contracts in Bankruptcy; Understanding "Rejection,"* 59 U.Colo.L.Rev. 845 (1988); Jay Westbrook, *A Functional Analysis of Executory Contracts,* 74 Minn. L.Rev. 227 (1989); Michael T. Andrew, *Executory Contracts Revisited, A Reply to Professor Westbrook,* 62 U.Colo.L.Rev. 1 (1991). The policy underlying priority treatment for administrative expenses is to encourage creditors to extend credit to debtors which will enable a reorganization to succeed. *See In re Jartran, Inc.,* 732 F.2d 584, 586 (7th Cir.1984). To that end,

in order to demonstrate the priority of an administrative claim, the debt must (1) arise out of a transaction with the debtor-in-possession and (2) benefit the operation of the debtor's business. *Id.* at 586–87, *citing In re Mammoth Mart, Inc.,* 536 F.2d 950, 954 (1st Cir.1976).

■ This two-part test employed in *Jartran* and *Mammoth Mart* is applied to executory contracts such as Employment Agreements even if the agreement has been rejected. *See, e.g., In re Hooker Invs., Inc.,* 145 B.R. 138, 144 (Bankr. S.D.N.Y.1992); *In re APF Co.,* 270 B.R. 567, 572 (Bankr.D.Del.2001); *In re Commercial Fin. Servs., Inc.,* 246 F.3d 1291 (10th Cir.2001) (the lump sum cash payments due on termination under employment contracts not assumed by the debtors held not entitled to administrative priority); *In re Carmichael,* 109 B.R. 849, 851–52 (Bankr.N.D.Ill.1990).

In *Pre–Press I,* this Court stated that:

The objectors, in applying [the first] prong [of the *Jartran* test] with the sole focus on the pre-petition date of the Agreements would, at first blush, appear to defeat Nolte's claim for administrative priority status. *Jartran,* however, also noted that this element can be met by a showing of *'inducement* of the creditor's performance by the debtor-in-possession....' 732 F.2d at 588 (emphasis in original).

By assuring Nolte that the Agreements would be 'going forward' and continuing to accept Nolte's services and the benefits flowing therefrom, the Debtor induced Nolte's performance. The evidence adduced at trial is undisputed that the Debtor urged and used Nolte's continued services and efforts post-petition.... Nolte performed until employ-

ment negotiations failed, which led to the Debtor's rejection motion.

*Pre–Press Graphics, Inc.,* 287 B.R. at 731.

■ With respect to the first element of the *Jartran* test, the Court similarly finds that the Debtor induced Nolte's services, and derived benefits from those services, which he undisputably continued to render, after the entry of the Rejection Order. Even though the Debtor rejected Nolte's Employment Agreement in August 2002, *Pre–Press I* established that even after the rejection of the Employment Agreement, the Debtor induced Nolte to perform for the benefit of the Debtor. *Id.* at 731.

In the instant matter, the Debtor does not allege that Nolte's second administrative claim fails because it arises from pre-petition agreements. Rather, the Debtor claims that Nolte did not benefit the estate to the extent of the claimed $21,037.11, and therefore the claim fails the second prong of the *Jartran* test. As distinguished from the objections in *Pre–Press I,* there is no objection that Nolte's claim arises from a transaction with the Debtor post-petition, and this Court finds the first element of the *Jartran* test has been satisfied.

■ As to the second element of the *Jartran* test, the Debtor contends that Nolte's second administrative claim should fail because the amount due has been overstated. The Debtor contends that Nolte's claim has been overstated for the following reasons: (1) that Nolte's termination date was August 15, 2002 rather than August 28, 2002; (2) that Nolte has claimed commissions on sales where the customer refused to pay the Debtor; (3) that Nolte took excess vacation time for which he owes the Debtor, and that Nolte owes the Debtor on an invoice for a company owned by Nolte. The Debtor also argues that the estate incurred losses based on Nolte's performance when customers refused to

pay invoices submitted by the Debtor for jobs on which Nolte was the salesman. At issue is whether and to what extent Nolte worked for the benefit of the Debtor after August 15, 2002 and whether and to what extent he benefitted the Debtor's estate and is therefore entitled to commissions in conjunction with such benefits.

In the instant matter, the Court finds that Nolte provided post-petition benefits to the Debtor by continuing to perform work and was furnished access to the office staff, the computer system and office facilities after the Debtor had rejected the Employment Agreement. The Court finds that Nolte continued to work in the Debtor's office for the Debtor's benefit, and he also performed work with Marketing Drive beyond the date the Debtor rejected the Employment Agreement. For purposes of the present motion, the Court finds that Nolte has satisfied both elements of the *Jartran* test.

The Supreme Court stated in dicta that if the debtor elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor is obligated to pay for the reasonable value of those services, which, depending on the circumstances of the particular contract, may be what is specified in the contract. *See National Labor Relations Board v. Bildisco and Bildisco,* 465 U.S. 513, 531, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (citations omitted).

▇ In administrative wage claims the amount claimed as compensation for the services must be found to be reasonable. Section 503(b)(1)(A) does not impose a statutory maximum on administrative wage claims. The courts have, thus, policed against excessive wage claims by demanding that the claim not be disproportionate to the value of the services rendered. *See 2 W. Norton Jr., Norton*

*Bankruptcy Law and Practice 2d,* § 42:18 at p. 42–101 (2d ed.1994). *See also In re Chicago Lutheran Hosp. Ass'n,* 75 B.R. 854, 857 (Bankr.N.D.Ill. 1987) (post-petition wage related claims are entitled to be treated as first priority administration claims under § 503(b)(1)(A) and § 507(a)(1)).

On this point, the Debtor argues that Nolte's claim is overstated with respect to the compensation due to him for base salary, sales commissions, expenses and fringe benefits. Hence, the ultimate question turns on whether the amount of Nolte's administrative claim as calculated under the Employment Agreement is equal to the reasonable value for his services rendered post-petition for the Debtor.

Nolte is entitled to the wages claimed until his actual termination date, and any commissions he is entitled to in proportion to the value of the services rendered. This Court thus finds that Nolte's actual date of termination was August 28, 2002. The evidence presented reflects that Nolte performed services for the benefit of the Debtor beyond the rejection of the Employment Agreement. Based on the timekeeping records, testimonial evidence presented and correspondence which took place between the Debtor's employees and Nolte until August 28, 2002, Nolte is entitled to salary compensation for 13 working days between August 11, 2002 and August 28, 2002. The Court notes that the closing remarks of the email message from Thomas to Nolte speak to this point. The email message indicated that if Thomas did not receive an executed employment agreement, there would be an interruption in pay and insurance deductions. *Id.* The Court finds that if Nolte had been terminated on August 15, 2002, there would have been no motivation for Thomas to include such a remark at that time; the interruptions in pay and insurance deduc-

tions would have previously begun. Based on the annual base salary of $75,000.00, the Court finds that Nolte is owed the amount of $288.46 per day for 13 working days between August 11 and August 28, 2002, for a total due of $3,749.98 in unpaid wages.

■ The Debtor claims that Nolte's claim should be reduced by vacation time used but unearned. Where vacation pay accrues per month, as is the case here, "then it vests as soon as the work is done and is due on demand." *In re Northwest Eng'g Co.*, 863 F.2d 1313, 1315 (7th Cir. 1988). It follows that where such vacation pay has not yet been earned, the employee is not entitled to compensation for unearned pay. Here, the Court finds that Nolte owes the Debtor for seven days of vacation for which he was compensated and which he used, but had not yet earned.

■ As discussed, the evidence presented indicates that Nolte had earned 12 days of vacation and used 19. Other courts have noted that in analyzing employee benefits under the *Jartran* test, the determinative factor is not when the right to payment matured but, rather, when payment was earned. *In re Uly–Pak, Inc.*, 128 B.R. 763, 766 (Bankr.S.D.Ill. 1991); *Chicago Lutheran Hosp. Ass'n*, 75 B.R. 854, 856 (Bankr.N.D.Ill.1987); *Northwest Eng'g Co.*, 863 F.2d 1313, 1316 (vacation pay held "earned" continuously as work is done for § 507(a)(3) priority purposes). The equitable result here is in accord with the underlying principle in *Northwest Eng'g Co.* 863 F.2d 1313. Therein, the court held that vacation pay would be afforded administrative priority because it was earned continuously as the work was performed. While *Northwest Eng'g* is not exactly on point, the Court is persuaded that the logic and dicta therein provides an appropriate basis to achieve the equitable result reached here because

"[c]ourts routinely conclude ... that vacation pay and bonuses may be paid out as administrative expenses only to the extent they reflect work done after the commencement of the case." *Id.* at 1316 (citations omitted). The court in *Northwest Eng'g* concluded that it was "congruent with the resolution of related problems, and consistent with the function of § 507(a), to hold that [pre-petition] vacation pay is 'earned' continuously." *Id.* The same logic applies to post-petition administrative expense claims under § 503(b) and § 507(a)(1).

Nolte has not claimed any entitlement to compensation for vacation time. Rather, the Debtor claims that Nolte's administrative claim must be reduced by the amount of seven days compensation because Nolte had not yet earned that time, but had used it prior to the termination date. Based on the reasoning set forth in *Northwest Eng'g*, it follows that any used but not yet earned vacation time should be withheld or deducted from his allowable administrative claim. Because he was terminated on August 28, 2002 and had only accrued 12 days of vacation, the Court finds that Nolte's claim will be reduced by his per diem salary of $288.46 for seven days, for a total of $2,019.22.

With respect to the automobile allowance, the Court finds that the $1,000.00 per month allowance is a proper administrative expense necessary for the preservation of the estate as defined within the meaning of "wages, salaries, or commissions" in § 503(b)(1)(A). Nolte was entitled to the allowance up until the date of termination, August 28, 2002. The allowance entitled Nolte to $32.87 per day based on a 365 day year. Thus, the Court will reduce Nolte's allowable claim by the sum of $98.61, representing the three days between August 28, 2002 and August 31, 2002 for which he was overpaid.

The major component of Nolte's claim at bar is for earned but unpaid commissions. In *Pre–Press I,* this Court found that Nolte was entitled to the quantum meruit value of the services he performed for approximately four months post-petition for the benefit of the Debtor. *Pre–Press Graphics, Inc.,* 287 B.R. at 734–35. The Court found that allowing the full amount of Nolte's claim would compensate him for services performed by other individuals and at a higher commission rate than exists in the industry. *Id.* at 733. In the instant matter, Nolte claims that he has not been compensated for a number of the jobs he worked on for the benefit of the Debtor post-petition. Specifically, Nolte claims he is entitled to $16,492.84 in sales commissions. In contrast, the Debtor acknowledges that it owes Nolte $2,867.32 in unpaid commissions. As stated in the Employment Agreement, commissions are calculated from sales invoices net of taxes and freight, and the amounts paid are adjusted to reflect returns, allowances, price concessions and similar matters. Debtor's Exhibit A, Article III, § 3.2. The commissions were to be paid bi-weekly pursuant to the Debtor's regularly scheduled payroll date and were to include a report of commissionable sales and commission rates. *Id.* Any commissions received relating to accounts receivable that were not collected within 90 days from the invoice date were to be deducted from any subsequent commissions due the employee and would be paid only when collected. *Id.*

Beevers testified that customers, in addition to Marketing Drive, refused to pay invoices for other jobs on which Nolte was the salesman and that as a result, the Debtor absorbed substantial losses. Beevers indicated that Steve Kramer ("Kramer"), another salesman, was assigned to Nolte's accounts and was paid commissions on many of the jobs that were in progress when Nolte was terminated. According to Beevers, several problems existed on these jobs that were attributable to Nolte, and that Kramer did the work on these jobs and was rightfully paid the commissions. The Debtor argues that to pay Nolte for jobs which it already paid to Kramer would expose the Debtor to paying double commissions. Kallman testified that she first started dealing with Kramer when Nolte was on vacation in August 2002. She also testified that she had prepared two purchase orders that she sent to Nolte's attention and that he would have received on or about August 21, 2002. *See* Nolte's Exhibit 6. She further testified that Nolte had satisfactorily performed work on jobs on behalf of the Debtor up until August 28, 2002.

Nolte claims he is owed a commission on job number 27518. Beevers testified that there were two jobs for this customer on which Nolte was the salesman, but the customer refused to pay in full. In full satisfaction of two invoices for two jobs, the customer ultimately paid $3,700.00. Because the customer had refused to pay the total amount due on these two jobs for which Nolte was the salesman, the Debtor refused to pay Nolte any commissions on job number 27518. The Court finds that Nolte is entitled to commission based on the $3,700.00 received by the Debtor for job number 27518.

With respect to job number 30972, both Beevers and Kallman testified that the Debtor received only $20,000.00, but that the Debtor's invoice was for $57,141.00. Kallman testified that she and her supervisor agreed with Nolte to pay the Debtor additional funds from other jobs on which the Debtor was involved to compensate for the underpayment on job number 30972. Kallman did not recall when this arrangement was agreed to, and she testified that it was not reduced to writing. Kallman

also testified that Marketing Drive paid the Debtor additional funds from other jobs to compensate the Debtor for funds due on this particular job. In addition, Nolte presented Kallman's notes, purporting to demonstrate that funds were taken from other jobs performed for Marketing Drive but were actually being used to pay-out on job number 30972. Nolte's Exhibit 21.

The Debtor claims through Beevers that as a result of Nolte's mismanagement on job number 30972, the customer refused to pay $37,141.00 of the $57,141.00 invoice and therefore, the account had to be reassigned from Nolte to another account manager. According to Beevers, this was the reason that Nolte received and is entitled to no commission on this invoice. The Court finds the evidence insufficient to demonstrate or corroborate that any additional funds were paid out based on work performed by Nolte on job number 30972, if they were in fact paid. However, the Court finds that Nolte is entitled to commission based on $20,000.00 received admittedly by the Debtor for job number 30972.

The balance of Nolte's claim for commissions relates to certain jobs not referenced on the Debtor's exhibits which he worked on while he procured sales qualifying under the Employment Agreement. He argues these were "missing jobs" for which he should be given credit for commissions earned but unpaid. With respect to Nolte's claim for commissions due on 10 missing jobs (job numbers 31869, 31924, 31944, 31946, 31950, 31952, 31985, 31986, 32000), the Court finds insufficient evidence to support this claim. The evidence supporting these missing jobs are Nolte's Exhibits 3 and 4; a commission report with handwritten notations indicating that those job numbers are "missing," and a handwritten note of what appear to be job numbers and names. *See* Nolte's Exhibits 3 and 4. With exceptions to be discussed below, there was little evidence presented to enable the Court to conclude that Nolte was due commissions on all of these jobs and that the Debtor had indeed been paid for these jobs.

Kallman testified that in September, 2002, the Debtor was paid $9,890.00 on job number 32000, and that Nolte was the salesman. The Court finds that Nolte is entitled to commission based on the $9,890.00 received for job number 32000.

Exhibit 13 indicates that job number 31869 (purchase order number 02169) was invoiced in the amount of $41,690.00. *See* Nolte's Exhibit 13. Kallman testified that this job was paid in full in the amount of $38,140.00. *Id.* The Marketing Drive purchase order for this job dated August 21, 2002, indicates that Nolte was the salesman of record. *See* Nolte's Exhibit 6. Based on the invoice and Kallman's testimony, the Court finds the evidence sufficient to demonstrate that Nolte is entitled to commission based on the $38,140.00 received for job number 31869.

Exhibit 15 indicates that job number 31924 (purchase order number 02170), a missing job, is dated September 17, 2002 and was invoiced by the Debtor in the amount of $15,266.00. Nolte's Exhibit 15. The Marketing Drive purchase order dated August 21, 2002 indicates the amount due was $16,266.00. Kallman testified that $15,266.00 was paid on job number 31924 and that this was a $1,000.00 reduction from the price reflected for that job on the Marketing Drive purchase order. This job does not appear in the commission run for August 2002, and the Court finds that Nolte is entitled to commission based on the $15,266.00 received by the Debtor for job number 31924.

With respect to the additional missing jobs the Court is unable to decipher any

documentary support for commissions due on these jobs, nor is there any information reflecting whether these jobs were invoiced and actually paid. Therefore, the Court finds that Nolte is not entitled to commissions on the others of the ten missing jobs.

The Court finds that Nolte is entitled to a 10% commission based on his work on jobs numbered 30972 ($20,000.00), 27518 ($3,700.00), 31869 ($38,140.00), 31924 ($15,266.00) and 32000 ($9,890.00). This totals $8,699.60. The Court, as discussed in *Pre-Press I*, notes that the 10% commission approximates the industry standard, and is therefore a reasonable measure of the value of Nolte's services. In addition, Nolte is entitled to the $2,867.32 which the Debtor agrees it owes Nolte for commissions earned which have not yet been paid. Thus, Nolte is entitled to additional commissions in the sum of $11,566.92.

Finally, the Debtor has also indicated that Nolte owes $100.00 on an invoice issued to a company owned by Nolte. As to this assertion, there has been no corroborating evidence presented to the Court. Accordingly, the Court will not reduce Nolte's claim by this amount.

To summarize, the Court concludes that the Debtor owes Nolte $15,316.90 based on the $3,749.98 in unpaid wages per Nolte's termination date of August 28, 2002 and $11,566.92 in unpaid commissions. Nolte owes the Debtor $2,117.83 based on the $2,019.22 for vacation time used but unearned and $98.61 for the August 2002 auto allowance. Therefore, the Court concludes that in sum, Nolte is entitled to an administrative priority claim in the amount of $13,199.07.

## IV. *CONCLUSION*

For the foregoing reasons, Nolte's motion is granted in part, and the objections thereto are sustained in part. Nolte's claim is partially allowed as a post-petition priority expense of administration under § 503(b)(1)(A) and § 507(a)(1) in the sum of $13,199.07. This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.

## *ORDER*

For the reasons set forth in a Memorandum Opinion dated the 10th day of November 2003, the Court grants, in part, the motion of David A. Nolte for payment of post-petition compensation obligations associated with his employment agreement with Pre-Press Graphics Company, Inc. The Court holds that David A. Nolte's claim is partially allowed as a post-petition priority expense of administration in the sum of $13,199.07 under 11 U.S.C. § 503(b)(1)(A) and 11 U.S.C. § 507(a)(1). The objections thereto are sustained in part.